# United States Court of Appeals
## For the First Circuit

No. 11-2347

UNITED STATES OF AMERICA,

Appellee,

v.

ANGEL AYALA-VAZQUEZ,

Defendant, Appellant.

No. 12-1540

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS XADIEL CRUZ-VAZQUEZ,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Perez-Gimenez, U.S. District Judge]

Before

Thompson, Baldock,[*] and Lipez,
Circuit Judges.

---

[*] Of the Tenth Circuit, sitting by designation.

Nathan P. Diamond for appellant Angel Ayala-Vazquez.

Rafael F. Castro Lang for appellant Luis Xadiel Cruz-Vazquez.

Timothy R. Henwood, Assistant United States Attorney, with whom Nelson Pérez-Sosa, Assistant United States Attorney, and Thomas F. Klumper, Assistant United States Attorney, were on brief, for appellee.

---

April 30, 2014

---

**THOMPSON, <u>Circuit Judge</u>**.  Blood is often thicker than water.  Brothers Angel Ayala-Vazquez ("Ayala") and Luis Xadiel Cruz-Vazquez ("Cruz") (collectively, "appellants") appeal their convictions on multiple criminal charges related to their involvement in a wide-ranging drug trafficking organization based out of the Jose Celso Barbosa Public Housing Project ("Barbosa") and the Sierra Linda Public Housing Project ("Sierra Linda") in Bayamon, Puerto Rico.  Unlike dozens of others who entered guilty pleas, and some others who testified against them in the hope of lessening their own punishments, Ayala and Cruz hunkered down and stood trial together.  They were both convicted, and each received a life sentence.

The two brothers now argue they should be acquitted because the evidence introduced at trial was not sufficient to support the jury verdicts.  Failing that, they seek a new trial on the grounds that the trial judge improperly acted as an extra prosecutor and added to the evidence against them through the way in which he questioned several witnesses.  Should neither of these claims be resolved in his favor, Cruz additionally contests his life sentence on the grounds that he was less culpable than his brother and, therefore, he should not be fated to spend the rest of his life in prison too.

We have carefully considered the extensive trial record and the brothers' legal positions.  After doing so, we conclude

there is no merit to any of the arguments advanced by the brothers on appeal.  Accordingly, we affirm their convictions and Cruz's sentence.

## BACKGROUND

We set forth the basic facts in the light most favorable to the verdict, United States v. Rios-Ortiz, 708 F.3d 310, 312 (1st Cir. 2013), reserving additional details for our discussion of the specific issues raised in this appeal.  Brothers Ayala and Cruz were arrested and indicted following a federal investigation into an extensive and long-lived drug trafficking organization ("DTO") based out of Barbosa.[1]  The appellants were indicted together along with sixty-three other individuals alleged to have taken part in the DTO.  The Indictment identified each defendant by first name, last name, and, if applicable, nicknames or aliases.[2]  When it drew up the Indictment, the government assigned each defendant a number from one through sixty-five, with Ayala as number one and Cruz number eight.

The Indictment charged the appellants and other co-conspirators with selling a substantial amount of drugs, including

---

[1] The Indictment also charged the brothers with illegal drug distribution at Sierra Linda.  However, the testimony at trial--and the issues raised on appeal--focused on the DTO's activities at Barbosa.  Accordingly, we limit our discussion to the evidence related to Barbosa only.

[2]  The Indictment listed at least one alias for forty-eight of the sixty-five named defendants.

-4-

marijuana, cocaine base ("crack"), cocaine, and heroin at various drug points throughout Barbosa and at other locations. It further contained several counts of conspiracy to commit money laundering through various schemes, including one count alleging that the appellants put up drug money to pay for extravagant annual Christmas parties for Barbosa's residents. The Indictment also set forth forfeiture counts seeking a money judgement of $100,000,000, along with forfeiture of numerous motor vehicles, race cars, watercraft, and parcels of real estate in Puerto Rico and Florida.

The other defendants named in the Indictment--with the exception of a few who could not be located--reached individual plea agreements with the government, and in the end Ayala and Cruz were the only two who stood trial. The evidence at trial outlined in detail each brother's specific role in the DTO. We recount some of the undisputed highlights.

**1. Ayala**

As befitting his position as the first listed defendant, the government set out to prove that Ayala was the kingpin of the entire DTO. The eleven-count Indictment (ten counts of which were directed against Ayala) charged Ayala and sixty-four others with a panoply of drug crimes, including conspiracy with intent to distribute various controlled substances, conspiracy to import large quantities of cocaine into Puerto Rico, possession with intent to distribute controlled substances (heroin, crack, cocaine,

and marijuana) within one thousand feet of a public housing facility,[3] and conspiracy to commit money laundering. After a lengthy trial, the jury convicted Ayala on the first nine counts. Ayala does not contest the jury's acceptance of the vast majority of the facts testified to at trial. Instead, he argues that his conviction and sentence should be vacated due to a variety of other legal errors, which we will address in time. For now, we summarize the essential facts testified to at trial and to which Ayala does not object on appeal.

Ayala became involved with drug sales at Barbosa more than two decades ago, when he sold heroin, crack, cocaine, and marijuana. At first Ayala sold these drugs along with another man named Steven, but when Steven died in 1995 Ayala took over the DTO himself and became the "boss" or "leader of the drug point owners" at Barbosa. Ayala was "always armed for protection, because of local drug wars." The drug point owners within Barbosa paid rent to Ayala for the privilege of selling drugs there. Only people who Ayala knew or who had positions of responsibility within the DTO were allowed to sell drugs.

Witnesses testified that drug sales occurred at Barbosa twenty-four seven. To improve security, Ayala directed that gates

---

[3] Ayala concedes, and Cruz does not contest, that Barbosa is a low-income public housing project administered by the United States Department of Housing and Urban Development.

be installed between two buildings in Barbosa.[4]  The gates, which Ayala paid for, were intended to keep the drug sellers from being identified or apprehended by the police.  Two sellers worked at each gate, and drugs purchased there were literally handed to customers through the iron bars.  This physical barrier helped shield the sellers from any attempted arrest.  Sellers also wore shirts over their faces to conceal their identities from the police.

Also on the security front, Ayala employed lookouts to provide a further level of protection.  Lookouts were equipped with radios and were responsible for notifying higher-ups when police officers entered Barbosa or if they noticed anyone suspicious.  One witness testified she earned $75 for each shift she worked as a lookout.

The size and scale of the DTO's Barbosa operations can be appreciated from testimony regarding just a few of the drug sales there.  According to one of the coconspirators, Jose Arce Baez (number 37 on the Indictment), drugs were available twenty-four hours a day.  Baez recalled that on one day in March 2001, 240 grams of crack, 600 baggies of heroin, 10 to 15 packets of marijuana and 250 to 375 baggies of cocaine were sold.  A DEA informant, Burke Declet, said he purchased 3 vials of crack, 1 bag

---

[4] Nothing appears in the record as to how or why the Housing Authority would permit such a construction.

of marijuana, and 10 packets of heroin in April of 2008. Police officers also described a February 2009 raid at Barbosa that ended in a search of an apartment where the police discovered and seized a radio used by the drug lookouts, along with 1,000 "decks" of heroin and 400 "decks" of marijuana.[5] Chemical analysis determined these materials contained 146 grams of heroin and 428 grams of marijuana. A further search on March 27, 2009, resulted in the seizure of 51 grams of heroin and 300 grams of marijuana. Subsequent police searches led to the seizure of 285 grams of marijuana and 122 grams of heroin on April 7, 2009, 159 grams of cocaine on April 8, 2009, and 177 grams of crack on May 7, 2009.

Trial testimony further indicated that Ayala's involvement in the drug trade was not confined to sales in Puerto Rico. Indeed, one drug trafficker testified that, between 2005 and 2008, he imported "thousands of kilos of cocaine and a small portion of heroin" from the Dominican Republic for Ayala. Ayala and two other conspirators, he said, went on to ship at least some of those drugs to sellers in New York and other mainland destinations. One example of the scope of drug imports into Puerto Rico is a March 30, 2009, seizure by Puerto Rican police of a flatbed truck that had come in from the Dominican Republic. When they searched the truck, law enforcement agents discovered 182

_____

[5] A "deck," it was clear from the trial testimony, is an individual package of drugs. For example, a "deck" and a "baggie" of heroin are interchangeable terms.

kilos of cocaine and 12 kilos of heroin. There was also testimony that in 2008, law enforcement agents seized two vessels arriving from the Dominican Republic that contained drugs destined for Ayala's DTO. Police discovered 600 kilos of cocaine and 7 kilos of heroin on the first ship, and 397 kilos of cocaine on the second.

With respect to shipments to the mainland, one drug seller testified that between February and November of 2007, he received in New York as many as 100 kilograms per week from the DTO. Another trafficker testified that between 2000 and 2006 the DTO used commercial airlines to bring "kilos" of cocaine from Puerto Rico to New York and Florida. The amount of drugs brought in varied, but was between 120 and 300 kilos per trip. Trips were made two or three times each week, and the witness testified that in one month "about 5,000 kilos had been sent" to the mainland.

## 2. Cruz

The Indictment identified Cruz's role in the DTO as that of an "administrator" who "would, among other duties, supervise the day-to-day operations of the various narcotics distribution points within Barbosa, Sierra Linda and other locations within Puerto Rico." Cruz was charged with one count of conspiracy to posses with intent to distribute controlled substances, along with separate counts for possession with intent to distribute heroin, crack, cocaine, and marijuana. He also stood trial for his alleged

participation in a money laundering conspiracy. The jury returned a guilty verdict on each crime charged against him.

Like his brother, Cruz does not contest the substance of the testimony against him, focusing instead upon the inferences to be drawn from the evidence and the purported unfairness of his life sentence.[6] While Cruz concedes that he was in fact involved in the DTO and that he was an "administrator" at Barbosa and Sierra Linda, he maintains that his participation was "limited" to those two locales and characterizes his role as nothing more than a "third-tier administrator."

The testimony at trial indicated that Cruz was much more than a minor player in the DTO. One witness testified Cruz was in charge of daily operations at Barbosa whenever Ayala or the number two man, Omar Median Santiago, was not around. In this capacity, Cruz was responsible for ensuring the various drug points in Barbosa actually had drugs on-hand to be sold there.

As an administrator of the DTO, Cruz gave orders to others and made sure that people did not congregate in the middle of Barbosa. It was important to keep large groups from forming because this would attract attention from law enforcement agents who periodically came into Barbosa. In addition, testimony showed

---

[6] Throughout his brief, Cruz refers to certain witnesses as long-time drug addicts or as individuals testifying in the hopes of receiving lighter sentences in their own cases. Cruz, however, does not argue that we should disregard any of this testimony.

that Cruz worked as a runner delivering drugs to the sellers, assigned "shifts" to the sellers, informed drug sellers of locations in which the police had set up surveillance cameras, and explained to the sellers why they should cover up their faces.

Testimony further indicated that Cruz acted as an enforcer when necessary. In one instance, Jose Arce Baez (who testified against Ayala as well) explained that he worked as a seller and Cruz imposed discipline on individuals involved with the DTO at Barbosa. Baez recounted one incident where he himself was subjected to discipline as a result of having stolen "storm drains" from an apartment because he thought they were made of aluminum. When Cruz found out about this, Cruz took Baez aside into a stairwell and told him that he could either take a "slap in the face" as punishment or, failing that, Cruz could let Ayala know what he had done. Baez opted for a Cruz-administered slap. Baez also testified that he observed Cruz personally selling drugs from time to time.

Having adequately framed the backdrop, we now take up the appellants' specific arguments.

### DISCUSSION

The appellants raise various grounds on appeal in their attempt to reverse their convictions or, at the very least, obtain a new trial. In seeking to reverse their convictions, the appellants challenge the sufficiency of the evidence with respect

to certain counts of conviction. Failing that, they each claim entitlement to a new trial because the trial judge violated their right to a fair trial by acting as a prosecutor in his questioning of various witnesses. They say that the district judge, under the guise of questioning certain witnesses, abused his discretion by making comments that added to the evidence against them. Finally, Cruz solely argues that even if he is not entitled to an acquittal or a new trial, his life sentence should be vacated as procedurally and substantively unreasonable.

Unsurprisingly, the government disagrees. In its view the convictions should stand because the evidence at trial-- including witness testimony, videotape, and seized drugs--more than suffices to allow a reasonable jury to return guilty verdicts. The government then urges us not to grant new trials because the trial judge did not exceed his authority in questioning witnesses and commenting on the evidence. As a fallback, the government argues that even if the trial judge erred in his trial participation, the appellants still are not entitled to a new trial because any such error was harmless. And with respect to Cruz's life sentence, the government states that it is procedurally and substantively reasonable in light of the evidence adduced at trial, and asks us to affirm it.

We address the arguments of each appellant in turn, beginning with their sufficiency of the evidence arguments.

## I.  AYALA'S CHALLENGE TO THE SUFFICIENCY OF THE EVIDENCE

Ayala challenges the sufficiency of the evidence with respect to three aspects of his convictions for drug possession and money laundering.  First, he argues the government did not introduce sufficient evidence to allow the jury to find him guilty of possessing with intent to distribute illegal drugs within 1,000 feet of a public housing facility in violation of 21 U.S.C. § 860. Next, he challenges the sufficiency of the evidence to support the jury's drug quantity findings.  Finally, he contends that the jury did not have enough evidence to find that he was involved in any of the financial transactions alleged in Counts VII through IX.

Although Ayala argues that his sufficiency of the evidence challenges present questions of law--which engender de novo review--our review of the record shows Ayala did not muster a sufficiency challenge as to any of the evidence admitted at trial. Accordingly, this issue has not been preserved for appellate review.  We, of course, "review an unpreserved challenge to sufficiency of the evidence only for plain error."  United States v. Pratt, 568 F.3d 11, 15 (1st Cir. 2009).  When employing plain error review, we will affirm the conviction unless doing so "would result in a 'clear and gross injustice.'"  Id. (quoting United States v. Bello-Perez, 977 F.3d 664, 668 (1st Cir. 1992)).  We address each of these issues separately.

**a.   Possession With Intent to Distribute (Counts III - VI)**

Ayala's first sufficiency challenge is to his convictions on Counts III through VI, which alleged violation of 21 U.S.C. § 860 for possessing with intent to distribute illegal drugs within 1,000 feet of a public housing facility.[7]  Delineating the contours of his challenge, Ayala admits the evidence allowed a jury to find that he possessed illegal drugs with intent to distribute them in Puerto Rico.   He further concedes that there was enough evidence for the jury to make the following findings:   (1) Ayala supplied drugs to sellers who were selling inside Barbosa; (2) the sellers in turn sold those drugs inside Barbosa; (3) the sellers kept those drugs in apartments and in vehicles; and (4) Ayala charged rent to the sellers.   He argues, however, that once he turned the illegal drugs over to the sellers, he no longer had actual or constructive possession over the drugs that were ultimately sold at Barbosa. Expressed differently, Ayala's position is that once he placed the drugs into the stream of (illicit) commerce, they were no longer his drugs and, therefore, he is not responsible for their further downstream distribution to the end users.   Thus, he urges us to overturn his convictions on the grounds that the evidence did not

---

[7] The jury specifically found that the offenses charged in Counts III through VI occurred within 1,000 feet of a public housing facility.

prove he possessed with intent to distribute illegal drugs <u>within</u> <u>Barbosa</u>.[8]

In rebuttal, the government argues the evidence at trial showed Ayala controlled the DTO and, therefore, actually or constructively possessed the illegal drugs distributed at Barbosa even after they had left his physical custody.  In support of this theory, the government cites testimony from cooperating witnesses to the effect that Ayala rose through the ranks of the drug organization until he finally became the leader and took control of the entire DTO from 1997 onwards.  The government then goes on to argue that the evidence showed Ayala controlled the specific manner of distribution within Barbosa itself.[9]

21 U.S.C. § 860 makes it illegal for an individual to "distribut[e], possess[] with intent to distribute, or manufactur[e] a controlled substance in or on, or within one thousand feet of, the real property comprising a . . . housing facility owned by a public housing authority."  21 U.S.C. § 860(a).

_____

[8] As a corollary, Ayala argues that proof of possession within a public housing facility is a necessary element of the crimes charged against him.  Accordingly, he asserts that his convictions can not be sustained on the basis of evidence that he possessed with intent to distribute illegal drugs in Puerto Rico generally. The government does not contest this aspect of Ayala's appeal.

[9] The government also argues the evidence showed, at the absolute minimum, that Ayala was guilty of aiding and abetting the distribution of drugs within Barbosa.  Because we conclude Ayala was properly convicted as a principal, we have no need to address a theory of accomplice liability.

Here, Ayala does not contest that the drugs are "controlled substances" or that Barbosa constitutes a "housing facility owned by a public housing authority." Instead, Ayala's argument is centered on his contention that once the drugs left his physical custody, he no longer possessed them or controlled the particulars of their ultimate distribution and, therefore, is not guilty of possession with intent to distribute at Barbosa in violation of 21 U.S.C. § 860.

"In order to prove possession with intent to distribute, the government must show that the defendants knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute." United States v. Garcia-Carrasquillo, 483 F.3d 124, 130 (1st Cir. 2007). To establish constructive possession, the government must show the defendant "knowingly ha[d] the power and intention at a given time to exercise dominion and control over an object either directly or through others." Id. Possession may be solely by one defendant or jointly with others, which "occurs when both the defendant and another person share power and intent to exercise dominion and control over contraband." United States v. Howard, 687 F.3d 13, 18 (1st Cir. 2012) (internal quotation marks omitted). Having carefully reviewed the record, we conclude that the evidence at trial proved Ayala, through his control of the DTO, retained

constructive possession of the illegal drugs even after they had been distributed to the suppliers.

Ayala does not contest that he distributed drugs to sellers who ultimately sold those drugs at Barbosa. Indeed, the evidence at trial proved Ayala controlled all of the DTO's operations there. For instance, the testimony showed Ayala was responsible for having gates installed in Buildings 14 and 15 to protect sellers from arrest, and that he controlled the operation of these gates. There was also evidence that Ayala consolidated multiple drug points within Barbosa itself, directed sellers to distribute specific drugs out of specific buildings, and received proceeds from the drug sales at Barbosa. And, as we discuss later, there was evidence that Ayala instituted a regime in which he required runners and sellers to "work for free" on certain days each month and "donate" the money they would have made to finance annual, elaborate Christmas parties attended by members of the DTO and the residents of Barbosa.

From this evidence, a reasonable jury could conclude that Ayala was intricately involved with--and indeed, controlled--the entire DTO and all of its operations at Barbosa. Moreover, the evidence showed Ayala dictated where sellers could sell certain drugs at Barbosa, that he consolidated drug points there, and that he caused the runners and sellers to contribute portions of their earnings to pay for the Christmas parties put on by the DTO each

year at Barbosa. The jury was warranted in concluding that Ayala exercised dominion and control over the drugs even after they left his physical possession, through his control over his underlings in the DTO. Accordingly, the evidence at trial proved Ayala constructively possessed with intent to distribute illegal drugs at Barbosa in violation of 21 U.S.C. § 860. Garcia-Carrasquillo, 483 F.3d at 130.[10] Ayala's challenge to the sufficiency of the evidence with respect to his conviction on Counts III through VI is without merit.

**b.  Drug Quantity (Counts III - VI)**

Moving on, Ayala next challenges the jury's drug quantity findings with respect to his conviction on Counts III through VI. Ayala first recognizes the jury found as a fact that he possessed 1 kilogram or more of heroin, 288 grams or more of crack, 5 or more kilograms of cocaine, and 1,000 or more kilograms of marijuana, all inside Barbosa. He contends, however, that the only evidence as to drug weight at trial came from the amount of drugs the government actually seized at Barbosa. These amounts--173 grams of heroin, 377 grams of crack, 159 grams of cocaine and 1.2 kilograms of marijuana--Ayala points out, "fell far short of the charged amounts

---

[10] The Indictment, of course, also charged Ayala with violating 21 U.S.C. § 860 as an aider and abettor. On that theory of criminal liability, "[t]he vital element to be proven is that the aider and abettor shared in the principal's essential criminal intent." See United States v. Campa, 679 F.2d 1006, 1010 (1st Cir. 1982). The evidence at trial, however, proved that Ayala was guilty as a principal.

that the jury found."  He then concludes, without citing any authority, that the jury's ultimate finding with respect to drug quantity was based on nothing more than "speculation and guess work."

Not surprisingly, the government disagrees completely. It points out that in addition to the amount of drugs seized, witnesses at trial testified to the size and scope of the DTO and its drug sales.  This evidence included testimony that the drug point operated twenty-four seven until 2009.  The government also refers to testimony from cooperating witnesses regarding the amounts of each type of drug sold on a typical day.  For example, the government refers us to the witness testimony that heroin was sold in packages weighing a minimum of .22 grams per bag and that at least 500 such bags were sold each day; that 120 or more grams of crack were sold daily; that 250 to 500 baggies of cocaine were sold on a daily basis, with an average weight of .24 grams per baggie based on the seizure of 672 baggies; and that at least 100 packets of marijuana averaging 1.5 grams each were sold every day. By extrapolating these amounts over the life of the conspiracy, the government argues, the jury's drug quantity findings were amply supported by the evidence.

Simply put, Ayala's belief that the jury was prohibited from making a drug quantity determination that exceeded the amount of drugs actually seized is mistaken.  When determining drug

quantity, a jury may utilize and rely on witness testimony to mathematically calculate drug quantities (based on, e.g., testimony as to the duration of possession and distribution multiplied by the amount distributed on a given day). United States v. Aviles-Colon, 536 F.3d 1, 26 (1st Cir. 2008). Obviously in this case, the jury made a drug quantity finding significantly exceeding the amount of drugs actually seized by the government at Barbosa. We are satisfied, however, that the trial testimony regarding the scope of daily drug transactions in Barbosa supported the jury's ultimate findings. Moreover, this was based not only on witness testimony, but also the average weight of individual packages seized by the government. In addition, although no witness testified as to the weight of marijuana bags sold as part of the conspiracy, the jury had sufficient evidence to infer their weight based upon the evidence of (1) an undercover purchase of a bag weighing 2.2 grams, and (2) the 1.5 gram average weight of the 953 bags actually

seized.[11]  Accordingly, the jury's findings with respect to drug quantity were supported by the evidence introduced at trial.

### c.  Money Laundering Conspiracy (Counts VII - IX)

Finally, Ayala argues that his conviction on Counts VII through IX should be overturned because there was no evidence at trial as to his personal involvement with any of the financial transactions alleged in those Counts.  His position is that, although the government's evidence "established each of the three crimes of money laundering conspiracy, themselves," the government nevertheless failed to establish one essential element of the crime as it relates to him.  Relying on United States v. Gotti, 459 F.3d 296, 335 (2d Cir. 2006), Ayala argues the government was required to show that he, as the principal, personally initiated, concluded, or participated in each transaction.  The government's response is, essentially, that the evidence at trial allowed the jury to conclude that Ayala was the boss or leader of the entire DTO, that Ayala imposed a structure on the drug sellers to collect money

---

[11] We note that there was only a single undercover purchase of marijuana which, standing alone, would not have constituted sufficient evidence to allow the jury to make a determination as to marijuana quantity.  See United States v. Rivera-Maldonado, 194 F.3d 224, 232 (1st Cir. 1999).  It does, though, serve as a "sample" for the jury's consideration with respect to the average weight of the 953 bags that had been seized.  And, in any event, the evidence showed that those 953 bags had an average weight of 1.5 grams each.  Combining this average weight with witness testimony that there were daily sales of between 10 and 15 packets of marijuana--each containing 25 smaller bags of marijuana-- provides more than enough support for the drug quantity found by the jury.

throughout the year to finance the annual Christmas parties, that Ayala directed the purchase of race cars and other luxury vehicles (so-called "daily-drivers") through "straw buyers" who owned those vehicles in name only, and that drug money was used to pay for all of Ayala's vehicles, both the race cars and daily-drivers.[12]

Ayala's challenge to the sufficiency of the evidence on these Counts is without merit. By basing his argument on the lack of evidence of his direct involvement in the alleged financial transactions, Ayala overlooks that each money laundering count charged him as a participant in a money laundering conspiracy in violation of 18 U.S.C. § 1956(h). That statute makes it a crime for anyone to knowingly engage in certain financial transactions involving the proceeds of unlawful activity. See 18 U.S.C. § 1956(a). The specific section Ayala was charged under, Section 1956(h), declares that "[a]ny person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h). Thus, to secure a conviction the government needed to prove not that Ayala himself carried out each transaction, but that he was part of a conspiracy the object of which was to engage in money laundering.

---

[12] Ayala's daily-drivers included luxury vehicles manufactured by Acura, BMW, Mercedes, and Lamborghini.

The crime of money laundering comes in two varieties, "promotional" and "concealment." <u>United States</u> v. <u>Cedeño-Perez</u>, 579 F.3d 54, 57 (1st Cir. 2009). An individual is guilty of promotional money laundering if "(1) 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity,' he (2) 'conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity,' (3) 'with the intent to promote the carrying on of specified unlawful activity.'" <u>Id.</u> (quoting 18 U.S.C. § 1956(a)(1)(A)(i)). The second variety, concealment, differs only with respect to the third element. To convict an individual of concealment money laundering, the government must prove the first two elements of promotional money laundering and, third, that "the person conducts the financial transaction 'knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.'" <u>Id.</u> (quoting 18 U.S.C. § 1956(a)(1)(B)(i)).[13]

To convict Ayala of conspiracy to commit money laundering, the government was required to introduce evidence showing that Ayala had entered into an agreement with one or more

---

[13] Ayala does not contend on appeal that the transactions alleged in the Indictment are not "financial transactions" or that the DTO did not engage in "specified unlawful activity" within the meaning of 18 U.S.C. § 1956.

-23-

co-conspirators to commit either promotional or concealment money laundering.  See United States v. Misla-Aldarondo, 478 F.3d 52, 68 (1st Cir. 2007).  An agreement to enter into a conspiracy may be tacit or express.  United States v. Josleyn, 99 F.3d 1182, 1190 (1st Cir. 1996).  A conspiracy conviction requires proof that "the defendant voluntarily participated to promote a criminal objective."  Id.  We have also held that "[a] particular defendant need not have been familiar with all the details of the conspiracy or with the identities of all other conspirators" in order to be guilty of the conspiracy offense.  Id.

Count VII alleged that Ayala was part of a money laundering conspiracy that "utilized narcotics proceeds in order to organize, host and finance annual Christmas parties at . . . Barbosa" from 2004 through 2008.  The government introduced evidence at trial showing not only that Ayala was the unquestioned "boss" of Barbosa, but that he himself put in place a procedure to fund the Christmas parties by requiring sellers to contribute drug proceeds throughout the year.  There was also testimony showing that Ayala personally "hosted" the parties, and that he went up on stage with the performers hired through use of drug proceeds.

Moreover, the evidence showed that technicians working to put on the Christmas parties received their payment from one of Ayala's henchmen.  See United States v. Martinez-Medina, 279 F.3d 105, 116 (1st Cir. 2002) ("Purchasing large items with drug money

through third parties surely supports an inference of intent to conceal."). When Ayala's men paid the technicians, the payment was generally placed in plastic or paper bags. See Cedeno-Perez, 579 F.3d at 61 (finding that such packaging demonstrates an intent to conceal). Also relevant is the form of payment itself: usually, the technicians were paid in small bills. See United States v. Hall, 434 F.3d 42, 52 (1st Cir. 2006) (citing United States v. Misher, 99 F.3d 664, 668-69 (5th Cir. 1996) (recognizing that using small bills "made it more difficult for anyone to trace the . . . payment" and allows the jury to conclude that a purpose of the transaction is to conceal the source of the funds)).

Under these circumstances, the jury had enough evidence to conclude, at a bare minimum, that Ayala knowingly participated in a conspiracy to conduct financial transactions using drug money with the intent either to promote the DTO's continued success (by maintaining good relations with Barbosa's residents) or to conceal the nature and source of the proceeds used to fund those parties. More than that though, because there was evidence that Ayala established procedures to fund these parties, the jury would also have been warranted in convicting him on a theory of his direct participation in money laundering. Accordingly, we affirm his conviction on Count VII.

Count VIII and Count IX both alleged Ayala participated in a conspiracy to commit money laundering through the acquisition

of various vehicles. Count VIII rested on the purchase of a race car, trailer, and truck, while Count IX was predicated upon the purchase of various luxury cars that Ayala used as daily-drivers. Once again, ample evidence at trial supported his convictions on both counts.

Beginning with the race vehicles, testimony at trial indicated that Ayala had been involved in the purchases of a $144,000 race car named Major League, a $45,000 trailer, and a $70,000 truck to haul the race car and trailer. There was also evidence that the truck and the trailer were registered to Humberto Cruz-Ortiz, a drug seller in Ayala's DTO. Although the vehicles may have been registered to someone else, witnesses testified at trial that Ayala owned two race cars, Major League and La Adriana, that he used the truck and trailer to transport his race cars, and that they had actually seen Ayala racing Major League. This eyewitness testimony was supported by documents Ayala signed in 2006 before racing Major League stating that he was responsible for the race car. Based on this evidence, the jury could have reasonably concluded Ayala used a "straw purchaser" to buy and register these vehicles in order to conceal the fact that they were bought and paid for with drug money.

The government also introduced sufficient evidence to secure a money laundering conviction with respect to Ayala's daily-drivers. One witness testified that Ayala acquired these vehicles

without anyone knowing they were his by having someone else fill out the paperwork for the purchase and subsequent registration. Ayala, though not the registered owner, made the monthly payments on these vehicles, and the "straw purchaser" received payment for his participation in filling out the paperwork. There was also testimony that many of the payments for Ayala's luxury vehicles were made in cash that "came from drug trafficking." Ayala himself stipulated that 29 out of 30 payments for a $68,000 Acura MDX were in the form of cash. He further stipulated that an FBI agent observed him driving that vehicle in May of 2009. Accordingly, just as there was evidence showing that Ayala had created a system for laundering money through annual Christmas parties, there was evidence that he masterminded a similar scheme for the purchase of his daily-drivers. As such, we affirm the jury's verdict with respect to Count IX.

## II. CRUZ'S CHALLENGE TO THE SUFFICIENCY OF THE EVIDENCE

Like Ayala, Cruz argues that insufficient evidence was introduced at trial to allow the jury to return a guilty verdict with respect to Count VII. Recall that Count VII alleged he (like his brother) was guilty of entering into a conspiracy to launder money by putting on annual Christmas parties at Barbosa. Cruz, however, does not raise a sufficiency of the evidence challenge to any of the other counts of which he was convicted.

The record here shows that at the close of the evidence, Cruz moved for a judgment of acquittal pursuant to Rule 29 with respect to Count VII. In making his motion, Cruz argued that he was entitled to an acquittal based on the lack of evidence that Cruz conducted any financial transactions related to or was involved in the financing of any of the annual Christmas parties. The trial judge, however, denied the motion based on evidence that Cruz "was the administrator of the drug points there while his brother or Mr. Omar was not present," that Cruz gave orders to others involved in the conspiracy, and that he was responsible for things such as making sure there were drugs at the various drug points and keeping addicts from milling around the drug points.

Because Cruz, unlike his brother, did challenge the sufficiency of the evidence at trial, this issue has been preserved for appellate review. Preserved challenges "to the sufficiency of the record evidence are reviewed de novo." United States v. Ossai, 485 F.3d 25, 30 (1st Cir. 2007). Under this standard, we affirm the jury's verdict "unless the evidence is insufficient to permit the jury rationally to find, beyond a reasonable doubt, each essential element of the charged offense." Id. We have already set forth the elements of conspiracy to commit money laundering in our discussion of Ayala's challenges to his convictions, and we will not repeat ourselves here.

Cruz's argument on appeal with respect to Count VII varies little from what he presented at trial. Notably, he admits here that the trial evidence showed he "was a member of the conspiracy to possess and distribute drugs at the Barbosa-Sierra Linda Housing Projects charged in count one." He goes on to assert, however, that there was no evidence "linking him to the conspiracy to launder those specific funds" used towards putting on the Christmas parties. Cruz then argues, without citation to authority, that his membership in the drug conspiracy "did not have the effect of converting him into a co-conspirator of the money laundering conspiracy," and that any "potential inference that he may have known that the Barbosa Christmas parties were being paid with drug profits of [Ayala] was insufficient to establish he intended to be a participant or member of the money laundering conspiracy." In sum, he claims that a conviction requires proof of his intent to specifically join in the money laundering conspiracy.

The government argues the evidence showed Cruz was personally involved in activities that produced the proceeds used to fund the parties. According to the government, the evidence at trial showed that Cruz began working for his brother's DTO no later than 2003, and that he took on multiple roles, including those of administrator, runner, and occasional drug seller. According to the government, Cruz's position within the conspiracy--including his oversight of the drug point's daily operations--

"circumstantially showed Cruz's participation in the money laundering conspiracy."

After careful consideration of the evidence adduced at trial, we conclude the evidence sufficed to allow the jury to conclude, beyond a reasonable doubt, that Cruz was a member of the money laundering conspiracy. First, we note Cruz concedes that he was a member of the overall drug conspiracy. Further, the evidence at trial allowed the jury to conclude not only that Cruz was a part of the conspiracy, but that he had taken on a managerial role and was deeply involved in the DTO. Based on his deep and long-term involvement with the conspiracy, the jury was permitted to infer that Cruz had knowledge that drug money was being used to finance the yearly high-profile Christmas parties[14] with the intent of concealing the drug proceeds and/or promoting the object of the

---

[14] The testimony of Jose Miguel Marrero Martel, an admitted member and leader of another drug-trafficking organization that imported drugs into Puerto Rico and sold them to Ayala's DTO (among others), is helpful to get an idea of the size of these parties. Martel testified the 2006 party had a designated parking area, private security guards, and a VIP section with campers, a tent, chairs, tables, and free food and drinks for the DTO's "drug traffickers." The VIPs were able to see the stage from the side so they "did not have to be up front where everybody was." It was from this area that Ayala himself watched the goings-on, at least when he was not dancing on stage.

The Christmas parties featured well-known performers, including Daddy Yankee, Wisin and Yandel, and Alexis and Fido who all appeared in 2007. The following year, Elvis Crespo was paid $12,000 for his performance there. According to Crespo's promoter, all $12,000 was paid in twenty-dollar bills contained in a small paper bag. As of the date of publication, a video clip purporting to depict a portion of Elvis Crespo's Barbosa performance is available at http://www.youtube.com/watch?v=3NX0g1h7LHc.

overall conspiracy.  See United States v. Martinez-Medina, 279 F.3d 105, 116 (1st Cir. 2002) (finding that the jury was permitted to find beyond a reasonable doubt that a defendant who had "deep involvement" in a drug conspiracy knew that certain air conditioners were being purchased to conceal drug money).

Even if this were not enough, the jury also had evidence showing that Cruz was much more directly involved in helping to fund the Christmas parties than he lets on.  As the overall leader of the DTO, Ayala had set up a system for collecting funds throughout the year by having members of the organization-- including drug point owners, runners, and sellers--work for "free" at certain times.  The money the sellers earned on these days was then picked up from Barbosa and set aside to pay for the annual party.  The testimony at trial showed that Cruz was intimately involved with the drug trade, as he worked in various capacities over the years, including as a runner and seller.  In fact, the evidence supported a finding that he was in charge of the day-to-day operations of the Barbosa drug points.

From this evidence, the jury could have concluded, beyond a reasonable doubt, that Cruz directly participated in the money laundering scheme by either contributing money to it directly during the times he worked as a runner or seller, and/or by overseeing the collection of funds from other members as part of his control of daily operations at Barbosa or as a fill-in boss

-31-

during Ayala's absences.  The jury could also have concluded, beyond a reasonable doubt, that Cruz knew the Christmas parties were paid for out of drug money and that their intent was to conceal the source, ownership, and control of those proceeds, as well as to promote the interests of the drug organization as a whole.  Accordingly, we affirm Cruz's conviction on Count VII.

### III.   COMMENTS MADE BY THE DISTRICT JUDGE

### a. Cruz's Adoption of Ayala's arguments

Before getting to the substance of the appellants' objections to the trial judge's participation at trial, we must first turn our attention to a preliminary matter.  Only Ayala fully sets forth an argument that the trial judge's comments deprived him of a fair trial.  Cruz seeks to adopt Ayala's position as his own because the claimed errors are "of equal application to [Cruz] and warrant[] the granting of a new trial due to the district court openly assisting the government during trial."  The government, however, posits that Cruz has not successfully adopted Ayala's argument since he has not made any showing of how it is applicable or pertains to him.  According to the government, we should conclude that Cruz has waived this ground of appeal.[15]

It is true that, typically, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed

---

[15] Cruz did not opt to file a reply brief or address this argument at oral argument.

-32-

argumentation, are deemed waived." <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990). However, "in a case involving more than one appellant or appellee, including consolidated cases, any number of appellants or appellees may join in a brief, and any party may adopt by reference a part of another's brief." Fed. R. App. P. 28(i). In order for one party to successfully adopt another's argument by reference, "the arguments adopted must be readily transferable from the proponent's case to the adopter's case." <u>United States</u> v. <u>David</u>, 940 F.2d 722, 737 (1st Cir. 1991).

Here, Cruz and Ayala were tried together, and the government attempted to prove both of them guilty of crimes arising out of the same alleged drug conspiracy. Ayala claims he is entitled to a new trial because the district judge, through his comments and questioning of witnesses (at least one of whom testified against both appellants), took on the role of an additional prosecutor and added to the evidence against him. His argument goes to the fairness of the trial itself, as he believes the judge's actions tainted the entire proceeding. Given the nature of this particular claim, Ayala's same fair trial arguments are readily transferable to Cruz's case, without the need for further explanation or development. Moreover, because Cruz stood trial along with his brother, if Ayala were to show that the judge deprived him of a fair trial, it would arguably follow that his comments and questions deprived Cruz of a fair trial as well.

-33-

Accordingly, the interests of justice cut in favor of our finding that Cruz has adopted Ayala's fair trial arguments.  See United States v. Castro-Davis, 612 F.3d 53, 69 n.16 (1st Cir. 2010) (considering the "interests of justice" when determining whether one party adopted another's argument by reference).  While Cruz's perfunctory statement may not suffice in every case to adopt another party's arguments, we do not hesitate to conclude that it was up to the task here in light of the obvious applicability of Ayala's arguments to Cruz's appeal.

**b. Setting the Stage and Framing the Issues on Appeal**

We move on to the substantive aspects of the fair trial arguments.  The appellants claim the trial judge deprived them of their right to a fair trial guaranteed by the Fifth Amendment through certain comments he made during trial.  Their objection centers around the trial judge letting the jury know that certain individuals referred to in trial testimony had been named in the Indictment, even though neither the witness nor prosecutor tied that individual by name to the Indictment.  The appellants point to twenty-three separate comments made by the trial judge during four days of trial from March 29 through April 4.  Although they set out citations to the record as to each of these twenty-three occasions,

the appellants do not make any individualized argument with respect to any specific comment.[16]

In rejoinder, the government argues that the trial judge acted at all times in accordance with his power to question witnesses and comment on the testimony. Most of those occasions, says the government, are in reality simply examples of the trial judge stepping in to clarify confusing testimony or to correct misstatements by both the prosecutor and defense counsel. The government goes on to urge us to find harmless any error, noting that the trial judge provided appropriate curative instructions and that, in its view, the evidence against both appellants was

---

[16] In his brief, Ayala makes a cursory allegation that the trial judge "also countered defense counsel's questions in a manner favorable to the prosecution."
Not only is this sort of bald-faced assertion insufficient to raise the issue on appeal, "[a]s a general rule, a judge's mid-trial remarks critical of counsel are insufficient to sustain a claim of judicial bias or partiality against the client." Logue v. Dore, 103 F.3d 1040, 1046 (1st Cir. 1997). Further, our review of the extensive transcripts reveals that the judge corrected the prosecutor on multiple occasions as well. Indeed, one of the appellant's twenty-three citations to the record actually refers to an occasion on which the trial judge corrected the prosecutor, not defense counsel. The only other of the twenty-three cited occasions that could even plausibly be considered a "counter" to defense counsel's questions is an admonishment not to continue a line of questioning relating to the government's attempt to obtain forfeiture of approximately $100,000 the witness had on hand when he was arrested. The record reveals that far from favoring the prosecution, the trial judge informed defense counsel that the forfeiture proceedings had not been completed, and cut off any further questioning in this regard. We are at a loss to imagine how this brief exchange could have prejudiced the appellants. We have now given more attention to this issue than have the appellants. It merits none further.

overwhelming anyways. Accordingly, the government believes the judge's conduct does not merit reversal.

We have reviewed each of the twenty-three cited sections of trial testimony. Four of them have nothing whatsoever to do with the appellants' arguments: on one occasion, the judge instructed defense counsel not to inquire further into topics related only to forfeiture of assets, and then a short time later corrected a misstatement made by the prosecutor. On a different date, the judge asked a witness about the source of certain monthly payments she had been receiving. Finally, and on yet another date, the trial judge asked a witness about how certain drugs were "branded" by their packaging.

The remaining nineteen occasions, however, involved the judge's questioning of a witness and identification of other individuals named on the Indictment. These occasions all followed a similar format. We set forth two such examples to demonstrate the general tenor of what went on.

March 30, 2011--the fifth day of trial--opened with the prosecutor resuming his questioning of Miguel Antonio Montes Nieves, who had taken the stand the previous day. At the outset of his testimony, Montes Nieves stated he was currently incarcerated following his guilty plea to charges lodged in 2007 of importing "kilos of cocaine" into Orlando, Florida from Puerto Rico. Up until his arrest, he was a member of Ayala's DTO, and he began

selling drugs with Ayala and Steven at Barbosa in 1993 or 1994.[17]

Per Montes Nieves's testimony, Ayala took over Steven's drug point after Steven was killed.

During his testimony Montes Nieves mentioned numerous individuals involved with the DTO, including his brother, who he first identified as "Miguel Angel Montes." The appellants bring the following exchange to our attention:

> Q. So for how long did your brother work the drug point after you got indicted?
>
> A. Well, until the day he was arrested.
>
> Q. And do you have a time frame for that?
>
> A. When he was arrested in the indictment with Angelo [Ayala].
>
> The Court: You say your brother's name is Miguel Angel Montes Nieves?
>
> The Witness: Yes.
>
> The Court: "Ito."
>
> The Witness: Yes.
>
> The Court: No. 25 of the indictment.

Defense counsel did not object to the trial judge's questioning. The twenty-fifth defendant listed on the Indictment is "Miguel Angel Montes Nieves, 'Ito.'"

Later that day, Montes Nieves testified about a meeting Ayala had called because "there were so many heroin drug points,

---

[17] As he had already been convicted for his role in the DTO, Montes Nieves was not a defendant on the Indictment.

you know, and a lot of people were being arrested."  The purpose of the meeting was to consolidate the drug points:  Ayala wanted "to get the heroin drug points and make it one ten-dollar heroin drug point and one three-dollar heroin drug point."  Montes Nieves testified that the following understandings came out of the meeting:

> Q.  And what else was agreed at that meeting?
>
> A.  Well, that  there was only going to be one ten-dollar heroin--
>
> The Interpreter:   No, I'm sorry.   The interpreter is going to correct herself. "That there was only going to be one ten-dollar cocaine."
>
> The Witness:   That was [Ayala's].  A five-dollar cocaine, which was [Ayala's]; crack, which was [Ayala's]; and then the heroin, well, Omar "El Gordo."  "Nino Brown" remained in charge of the heroin drug point per se. You know, they are the ones in charge of getting the drug, buy the drug, give it to my brother, who was in charge of the table, and after the table, seven days a week, each one of the owners of the drug point--because there were so many--the ones that I can mention now are "Raymond," "Chequito," "Popo," Los Olivo-- that is, Rosa, "Ñaña"-- Delvin.
>
> Those are the ones that I remember right now.
>
> Q.  What would happen--
>
> The Court:  Wait a minute.  "Checo" is Jose Rosario Oquendo?
>
> The Witness:  Yes.

The Court:    No. 11 in the indictment.[18] "Raymond" is Ramon Rosario Oquendo?"

The Witness:  Yes.[19]

The Court:  Are they brothers?

The Witness:  Yes.

The Court:  "Popo" is Pedro Juan Diaz.[20]

The Witness:  I don't know his name.  I know him by "Popo."

The Court:    All right.    And who were the girls?

The Witness:  Los Olivo.

The Court:  Is that Maribel Olivo Rivera?[21]

The Witness:  No, but they are family.

The Court:  Angel Soto Olivo?[22]

The Witness:  No.

The Court:  All right.  Go ahead.

The prosecutor then resumed the examination, again with no objection from defense counsel.

--------

[18] The eleventh defendant is identified on the Indictment as "Jose R. Rosario Oquendo, aka 'Checo.'"  None of the sixty-five individuals is identified by the alias, "Chequito."

[19] Defendant number 13 is "Ramon J. Rosario Oquendo, aka 'Raymond.'"

[20] Defendant number 15 on the Indictment is "Pedro Juan Diaz, aka 'Popo.'"

[21] Defendant number 59 is "Maribel Olivo Rivera."

[22] Defendant number 43 is "Angel Olivo Rivera, aka 'Tun Tun.'"

Save one other interaction we will momentarily describe, this testimony captures the essence of the challenged judicial conduct. Regardless of whether a witness was testifying on direct or cross-examination, if he or she mentioned the nickname of an individual thought to be listed in the Indictment, the trial judge broke in and asked the witness whether he or she knew more than the nickname. Sometimes this was done in the form of a question, and other times by way of an affirmative statement calling for the witness to respond affirmatively or negatively. If the witness confirmed the individual's name in full or in part, the trial judge often went on to state which number defendant he or she was on the Indictment. This happened eighteen times between March 29 and April 4, all without objection or comment from defense counsel.

On April 4, the eighth day of trial, and after the nineteenth such exchange, defense counsel expressed some displeasure with the trial judge. The triggering interaction involved the testimony of Jose Arce Baez, a drug seller in the DTO. Baez stated on direct examination that he had "exchanged the empty bag [of drugs] for a full one, from 'Martillo.'" The prosecutor followed-up by asking if Martillo was a seller too, and Baez responded "'Martillo' is a seller and he is arrested as well." The judge then chimed in asking, "Is it Jayson Serrano Andino?" Baez replied, "I know him as 'Martillo.' I know that his name is Jayson, but I do not know his last name." The judge then stated

-40-

"thirty-one," referring to defendant number 31, "Jayson Serrano Andino, aka 'Martillo.'" At this point, Ayala's counsel spoke up and, with the trial judge's permission, "reserve[d] a motion."

After the jury left for the day, Ayala's counsel made an oral motion "along the lines of the previously made motion."[23] Counsel first pointed out that "there has been a pattern and practice of the Court that when a witness identifies somebody by a nickname and then a question is asked about what his real name is, then there is a comment [from the trial judge] about he is No. X in the indictment that is being tried." Counsel told the trial judge that he believed the judge's comments improperly added to the witness's testimony. Specifically, by telling the jury that "Martillo" was named in the Indictment even though the witness who mentioned him did not know "Martillo's" full name, the trial judge, according to counsel, added to the evidence against the appellants.

In response, the trial judge stated that his comments were made in order to let the jury know when a witness was referring to one of "the defendants that are in the indictment." He then noted that when he read the Indictment to the jury before

---

[23] The "previously made motion" was Ayala's March 31st mistrial motion predicated upon a comment made by the trial judge. In making his April 4th motion, counsel did not explicitly request a mistrial. Ayala tells us, though, that by referencing his previous motion he intended to request a mistrial on April 4th. The government does not dispute Ayala's characterization of the motion. Accordingly, we presume the parties (as well as the trial judge) understood the April 4th motion as one requesting a mistrial, and we too shall assume Ayala sufficiently preserved a mistrial motion.

trial began, he did not read the defendants' nicknames or aliases. Thus, the trial judge explained that he was eliciting further information from witnesses and then telling the jury when certain individuals were named on the Indictment so the jury would know when a witness was talking about an alleged DTO member. The trial judge indicated he would stop doing this if defense counsel would agree "to give the indictment to the jury so they can look up the names" themselves.

Defense counsel declined the offer. Instead, he asked the judge to instruct the jury that "only Mr. Ayala" was on trial, not anyone else named on the Indictment.[24] He also asked the trial judge to tell the jury that, in questioning witnesses, he was "not commenting on the facts of the case." The trial judge did not go along with this proposal, and made a counter-offer instead. The judge stated he would give an instruction to the effect that none of the other individuals listed in the Indictment were on trial, and that "they are only to decide the case of Mr. Ayala and Mr. Cruz Vazquez." Maintaining he was "not commenting on any facts of the case," the trial judge refused to give any other instruction. Thus, although not stated explicitly on the record, by the end of the colloquy the trial judge had quite obviously refused to declare a mistrial. On appeal, Ayala argues the trial judge erred in refusing to grant his motion for a mistrial.

---

[24] The trial judge pointed out that Cruz was being tried too.

## c. Standard of Review

A trial judge's denial of a motion for a mistrial is reviewed for abuse of discretion.  United States v. Gentles, 619 F.3d 75, 81 (1st Cir. 2010).  Ayala based his motion on the trial judge's questioning of various witnesses and his occasional comments informing the jury that certain individuals had been named on the Indictment along with Ayala and Cruz.[25]  In his view, far from being innocuous, these comments deprived him of a fair trial because they actually constituted "crafty herding of the jury to the Government's side of this controversy."  When a party claims a trial judge's actions deprived him of a fair trial, we review the objected-to behavior for abuse of discretion, the same standard applied to our review of the trial judge's denial of the motion for a mistrial.  United States v. Mulinelli-Navas, 111 F.3d 983, 990 (1st Cir. 1997); Walsh v. United States, 371 F.2d 436, 437-38 (1st Cir. 1967).[26]  Our inquiry takes into account the record as whole.

---

[25] Although Ayala seeks to have us review each of the comments mentioned in his brief, he failed to object to any of the first eighteen at trial.  Moreover, neither he nor Cruz develop any argument on appeal with respect to the effect of each individual comment.  The appellants have forfeited any argument based on those specific comments.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  Accordingly, we review only the denial of the motion for a mistrial, taking into account, however, the aggregate effect of the judge's comments.  See United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1998).

[26] Ayala urges us to review the district judge's conduct "as a question of law," by which we presume he is seeking de novo review.  However, the case he cites for this request, Glasser v. United States, 315 U.S. 60, 82-83 (1942), lends him no support

United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1998) (noting that, when a defendant claims he has been prejudiced through a trial judge's interventions at trial, "[c]harges of partiality should be judged not on an isolated comment or two, but on the record as a whole").

**d. Analysis**

"It cannot be gainsaid that [a] fair trial in a fair tribunal is a basic requirement of due process. Accordingly, a trial judge should be fair and impartial in his or her comments during a jury trial." United States v. de la Cruz-Paulino, 61 F.3d 986, 997 (1st Cir. 1995) (internal citations and quotation marks omitted). Yet, "mere active participation by the judge does not create prejudice nor deprive the party of a fair trial." Deary v. City of Gloucester, 9 F.3d 191, 194 (1st Cir. 1993); see also Aggarwal v. Ponce School of Medicine, 837 F.2d 17, 22 (1st Cir. 1988). A judge's permissible participation includes the "common law power to question witnesses and to analyze, dissect, explain, summarize, and comment on the evidence." Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997). What a trial judge may not do, however, is take on the role of an advocate or "otherwise use his judicial powers to advantage or disadvantage a party unfairly." Id. In that vein, there is no question that it is "improper for a

whatsoever, as the Court applied an abuse of discretion standard in the cited passage.

judge to assume the role of a witness" by testifying to facts or authenticating evidence. Glasser v. United States, 315 U.S. 60, 82 (1942).

When addressing allegations of judicial bias, we consider "whether the comments were improper and, if so, whether the complaining party can show serious prejudice." United States v. DeCologero, 530 F.3d 36, 56 (1st Cir. 2008). Moreover, our review focuses on the entire record, "not an isolated comment or two." Polito, 856 F.2d at 418. And even an imperfect trial is not necessarily an unfair trial. United States v. Espinal-Almeida, 699 F.3d 588, 608 (1st Cir. 2012), cert. denied, 133 S. Ct. 1837 (2013), and cert. denied, 133 S. Ct. 2782 (2013).

As a general matter, there is nothing inherently improper about a judge posing questions at trial. The Federal Rules of Evidence explicitly vest a trial judge with authority to examine witnesses. Fed. R. Ev. 614(b) ("The court may examine a witness regardless of who calls the witness."). We have also recognized that a "judge has wide discretion to interject questions in order to throw light upon testimony or expedite the pace of a trial." Logue, 103 F.3d at 1045; see also United States v. Santana-Pérez, 619 F.3d 117, 124 (1st Cir. 2010) ("Among other things, the court has 'the prerogative, and at times the duty, of eliciting facts he deems necessary to the clear presentation of issues.'") (quoting United States v. Paz Uribe, 891 F.2d 396, 400 (1st Cir. 1989))

(further citation omitted).  Thus, the trial judge's questions here, geared towards eliciting identifications of individuals mentioned by witnesses on the stand, were not necessarily improper in and of themselves.

But Ayala's appeal is not premised solely on the judge's questions.  According to Ayala, the judge crossed the line into the realm of advocacy when he informed witnesses that certain individuals had been indicted along with the appellants.  As discussed above, the record shows that throughout the trial when a witness confirmed a particular individual had been indicted along with Cruz and Ayala, the trial judge stated what number defendant the individual was on the Indictment.  For instance, in one of our testimonial examples above, when witness Miguel Antonio Montes Nieves mentioned his brother, Miguel Angel Montes Nieves, and answered affirmatively to the judge's statement that he was known as "Ito," the trial judge simply put on the record that this individual was "No. 25 on the indictment."[27]

---

[27] Although the judge did not read the forfeiture allegations to the jury panel, his reading of the earlier portions of the Indictment was nearly verbatim.  The only significant difference is that the trial judge, for unknown reasons, did not read each of the nicknames or aliases.

It is the common practice of the district courts to read a criminal indictment in full at jury selection.  Indeed, there are many reasons why this should be so, but the one that stands out here is the unquestioned importance of determining whether any prospective juror knows a defendant by a nickname or alias.  In light of the multitude of defendants and nicknames in this case, we are at a loss to explain why--especially in the apparent absence of any objection--the trial judge read substantially all of the forty-

Because Ayala is unable to show prejudice, we need not, it turns out, determine whether the trial judge acted improperly in this case: even if the judge erred, we must affirm if we conclude that any such error was harmless. See United States v. Paiva, 892 F.2d 148, 159 (1st Cir. 1989) (applying harmless error analysis where the judge erred by "adding to the evidence").[28] After reviewing the entire record, which we do "to avoid magnifying on appeal incidents that were of little importance or significance at trial," we are satisfied that any error "had no substantial effect on the verdict." United States v. Jacquillon, 469 F.2d 380, 387-88 (5th Cir. 1972); see also United States v. Rodriguez-Rivera, 473 F.3d 21, 27 (1st Cir. 2007) ("We must consider alleged examples of judicial bias 'in light of the entire transcript so as to guard against magnification on appeal of instances which were of little importance in their setting.'") (quoting United States v. Candelaria-Silva, 166 F.3d 19, 35 (1st Cir. 1999)).

The relative infrequency of the complained-of comments-- which were made on only four of the eighteen days of trial--cuts against a finding of prejudice. The complete lack of any objection from defense counsel until the nineteenth such comment further

---

five-plus pages of the Indictment setting forth the charges against Ayala and Cruz, but elected not to read the nicknames and/or aliases.

[28] Indeed, even Ayala concedes that harmless error analysis applies.

militates against a finding of reversible error. This is especially so because the absence of an objection deprived the trial judge of an earlier opportunity to fully evaluate the effect of his questioning and comments upon the jury.

Furthermore, the judge instructed the jury on more than one occasion that his comments were not evidence and that it was up to the jury alone to find the facts. Indeed, one such instruction was given in the middle of trial on April 1, after Ayala's first motion for a mistrial, which was based on another allegedly improvident comment by the judge about a witness's testimony.[29] The judge's curative instruction included the following language:

> So you, the jury, are the sole judges of the facts and the credibility of the witnesses. Comments by me-- comments by the Court or counsel are not to be considered as evidence or as an indication of how to view that evidence-- how to view a particular testimony or piece of evidence or weight and value to be given to that evidence. This is your duty as jurors.

Notably, the nineteen occasions on which the judge questioned and/or identified witnesses of which Ayala complains occurred between March 29 and April 4. This means the jury was told in the midst of the objected-to conduct that the judge's comments are not evidence and that the jury is the sole finder of facts. Given the timing of this instruction vis-à-vis the trial judge's questions and comments, we keep in mind that "[w]here 'a

---

[29] A challenge to this comment is not raised on appeal.

curative instruction is promptly given, a mistrial is warranted only in rare circumstances implying <u>extreme prejudice</u>,'" <u>United States</u> v. <u>Freeman</u>, 208 F.3d 332, 339 (1st Cir. 2000) (quoting <u>United States</u> v. <u>Torres</u>, 162 F.3d 6, 12 (1st Cir. 1998)), and we presume that the jury followed this instruction, <u>Gentles</u>, 619 F.3d at 82.

The judge's final jury instructions are also relevant to our prejudice inquiry.  At the very beginning of the charge, the judge reminded the jurors of the respective roles of the judge and jury: "It is your duty to find the facts from all the evidence admitted in this case. . . . The determination of the law is my duty as the presiding Judge in this court."  He went on, telling the jury it "must not read into these instructions or into anything I may have said or done, any suggestion by me as to what the [<u>sic</u>] verdict you should return."  The judge also addressed the fact that some witnesses had pleaded guilty in connection with their own roles in the DTO:  "You may also consider their guilty pleas in assessing their credibility, but you are not to consider their guilty pleas as evidence against any defendant in this case."[30]

A little later, the judge addressed his questioning of various witnesses:

> In the course of a trial, I occasionally ask questions of a witness.  Do

---

[30] Neither Ayala nor Cruz, we note, contests the existence of the DTO.

not assume that I hold any opinion on the matters to which my questions may relate.

The Court may ask questions simply to clarify a matter, not to help one side of the case or hurt another side. Remember at all times that you, as jurors, are at liberty to disregard all comments of the Court in arriving at your own findings as to the facts.

The judge reminded the jury of their role a third and final time towards the end of the charge: "Your verdict must be based solely on the evidence and the law as I have given it to you in these instructions. However, nothing that I have said or done is intended to suggest what your verdict should be. That is entirely for you to decide."

We have long recognized in this Circuit that "'within wide margins, the potential for prejudice stemming from improper testimony or comments can be satisfactorily dispelled by appropriate curative instructions.'" United States v. Pagán-Ferrer, 736 F.3d 573, 587 (1st Cir. 2013) (quoting United States v. Sepulveda, 15 F.3d 1161, 1184 (1st Cir. 1993)). This is so even where the curative instruction is contained within the final charge and not given "immediately following the remark." Gentles, 619 F.3d at 83. And, as we did in Gentles, we note here that the jury was "amply admonished" during trial that the judge's comments were not evidence and that the members of the jury are the only finders of fact. See id. (quoting United States v. de Leon Davis, 914 F.2d

340, 345 (1st Cir. 1990)).  The judge's instructions given during and at the end of trial further cut against a finding of prejudice.

Finally, and perhaps most importantly, we have already determined that the evidence at trial was sufficient for the jury to return guilty verdicts against Ayala and Cruz.  In fact, however, the evidence of guilt was overwhelming.  Neither Ayala nor Cruz dispute that a DTO operated out of Barbosa.  Cruz even admits he was part of the DTO, while Ayala concedes on appeal that he possessed and distributed drugs within Puerto Rico.

To illustrate the overwhelming nature of the evidence against them, we reiterate and encapsulate what we previously discussed in the context of the appellants' challenges to the sufficiency of the evidence.  At trial, numerous witnesses that had been involved with the DTO testified to Ayala's leadership of it and Cruz's prominent role at Barbosa.  The witnesses testified in great detail about the types and amounts of drugs brought into Puerto Rico and distributed at Barbosa, as well as exactly how large quantities of drugs were shipped from Puerto Rico to the mainland.  Other members of the DTO described the particulars as to how drugs were sold at Barbosa, the measures taken to protect the DTO's sellers from arrest, and the procedures Ayala and Cruz implemented and enforced to minimize unwanted attention from the police and to warn drug sellers when police officers came into Barbosa.  There was a significant amount of testimony and

documentary evidence regarding Ayala's and Cruz's efforts to launder vast amounts of drug money through the purchase of race cars and luxury vehicles, and by putting on elaborate, high-profile annual Christmas parties for the Barbosa residents.

Overall, we conclude that the appellants are unable to show they suffered prejudice as a result of the judge's involvement at trial in light of the lack of objection to the first eighteen comments, the curative and final instructions given to the jury, and the sheer volume of evidence (including witness testimony and videotapes) introduced against Ayala and Cruz.  We are satisfied that "there is no chance that the remarks made prejudiced the outcome" of the trial.  Gentles, 619 F.3d at 83.  Accordingly, neither Ayala nor Cruz suffered "serious prejudice" as a result of the trial judge's comments, and neither is entitled to a new trial.[31]

---

[31] We take a moment to address Ayala's request that we utilize our "supervisory power to reverse [his] conviction" because this particular trial judge "has been given a pass for his behavior several times" and has "finally crossed the line" here.  While Ayala throws around the term "supervisory power," he does not cite any authority for what this power supposedly is and how it may appropriately be exercised here.  Accordingly, any such argument has been waived.  Zannino, 895 F.2d at 17.

We also hasten to point out Ayala's contention that the trial judge has been "given a pass for his behavior several times" is not supported by the two cases he cites in his brief, United States v. Santana-Pérez, 619 F.3d 117, 124-25 (1st Cir. 2010), and United States v. Ofray-Campos, 534 F.3d 1, 32-34 (1st Cir. 2008).  In Santana-Pérez, we held that even if the judge improperly demonstrated his disbelief of a witness through the form of his questions, the questions appeared to have a legitimate goal and, further, that any error did not satisfy the plain error standard,

Due to the lack of prejudice here, we conclude that any error in the judge's questioning and comments was harmless beyond a reasonable doubt. Accordingly, we have no need to determine whether the trial judge acted improperly. The question may have been close with regards to the one objected-to comment, and we think the judge's questions and comments likely made the prosecutor's job easier by clearly identifying certain individuals as members of the DTO. The trial judge, in effect, "filled in the blanks" for the prosecutor, especially with respect to the objected-to comment after the witness indicated that he did not know "Martillo's" full name.

Although we recognize that a trial judge may have "at times the duty[] of eliciting facts he deems necessary to the clear presentation of issues," Santana-Perez, 619 F.3d at 124 (internal quotation mark omitted), no such necessity is apparent on this record. From all indications, the prosecutor appears to have been well-prepared, competent, and more than capable of examining witnesses effectively and without creating confusion on the part of the jury. The better practice here, perhaps, would have been for

---

the only type of review available for the claim in that case. Santana-Pérez, 619 F.3d at 124-25. In Ofray-Campos we concluded the claim of "judicial bias [was] without merit." Ofray-Campos, 534 F.3d at 34. And even if this particular judge had been reversed in either of those two prior cases it would have no impact whatsoever upon our review of this appeal and the outcome here, as we must resolve this appeal on its own merits. Ayala's invocation here of our supposed "supervisory power" over the district courts borders on frivolous.

the trial judge to have read the complete Indictment (including all nicknames and/or aliases) at jury selection, to have remained silent and allowed the prosecutor to bring out whatever additional identifying information that he felt was necessary to his case, or to have provided the jury with a copy of the Indictment during trial so that the jury members could follow along and make the identifications themselves.

Before moving on, we take advantage of this opportunity to remind trial judges in this Circuit that when they do choose to exercise their power to actively involve themselves at trial, they must remain constantly vigilant to ensure they do not infringe upon the province of the jury by commenting or appearing to comment (positively or negatively) on a witness's credibility. Similarly, trial judges must guard against adding to the evidence or smoothing the pathway to a verdict in favor of either side under the guise of questioning witnesses or commenting on the evidence. In sum, trial judges must do their utmost to avoid creating the impression that they are anything other than unbiased neutral arbiters. See Starr v. United States, 153 U.S. 614, 626 (1894) ("It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling."); see also Glasser, 315 U.S. at 82 (A trial judge bears "the responsibility of striving for that atmosphere of

-54-

perfect impartiality which is so much to be desired in a judicial proceeding."). While we are well-aware of the many challenges presented to a district court judge presiding over a long and contentious trial, these are bedrock principles fundamental to the administration of justice. We are confident that the judges in this Circuit are up to the task.

## IV.  CRUZ'S LIFE SENTENCE

Finally, we reach Cruz's challenge to the life sentence imposed on him by the trial judge at the sentencing hearing. At sentencing, the judge applied the Sentencing Guidelines ("Guidelines") and determined that Cruz's base offense level based on the crimes of conviction and the involved drug quantity was thirty-eight. He then applied enhancements based on findings that the crime occurred in a "protected location," that it was reasonably foreseeable to Cruz that weapons "were possessed, carried and used by" members of the DTO, and because Cruz was an organizer of criminal activity that involved five or more participants. All told, the trial judge calculated a total offense level of forty-four, which he then treated as an offense level of forty-three per the Guidelines' requirements. With a total offense level of forty-three, the Guidelines-recommended punishment was life in prison, a sentence which the judge proceeded to impose.

Although the arguments set forth in his brief could have been stated with better clarity, Cruz essentially claims the

district court committed a variety of procedural errors with respect to sentencing, and that the life sentence is substantively unreasonable.[32] He argues it is unfair that he received the same life sentence as Ayala because Ayala was the leader while he was merely a "third tier administrator." He also believes his life sentence is not reasonable in comparison with those imposed on four codefendants who entered guilty pleas and were sentenced to 156 months, 180 months, 108 months, and 132 months, respectively. He succinctly describes the sentencing range he believes is justified by the evidence as follows: "[a] sentence higher than what the co-defendants who pled [guilty] but lower than what the leader [i.e., Ayala] received would have been a 'reasonable' sentence." The government predictably argues that the district court properly followed sentencing procedures and that the sentence is not unreasonable given that it is in accordance with the sentencing guidelines and is appropriate to Cruz's role in the drug conspiracy. We deal with these challenges seriatim.

a. **Standard of Review**

The Supreme Court has clearly delineated the nature and scope of our review of the district judge's sentencing decision. "[A]ppellate review of sentencing decisions is limited to determining whether they are 'reasonable.'" Gall v. United States,

---

[32] Cruz's brief has a tendency to combine, rather than separate, his arguments with respect to procedural and substantive unreasonableness.

552 U.S. 38, 46 (2007). Our "'review process is bifurcated: we first determine whether the sentence imposed is procedurally reasonable and then determine whether it is substantively reasonable.'" United States v. Leahy, 668 F.3d 18, 21 (1st Cir. 2012) (quoting United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011)). We employ the abuse of discretion standard in reviewing claimed procedural errors and in our consideration of the sentence's substantive reasonableness. United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008). And we take into account the totality of the circumstances surrounding both procedural and substantive reasonableness. Gall, 552 U.S. at 51.

We take up consideration of the procedural and substantive reasonableness of Cruz's sentence in turn.

b. **Procedural Reasonableness**

When we review a sentence's procedural reasonableness, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence--including an explanation for any deviation from the Guidelines range." Gall, 552 U.S. at 51. We make use of a "multi-faceted" abuse of discretion standard to make these determinations. Leahy, 668 F.3d at 21. "We review

-57-

factual findings for clear error, arguments that the sentencing court erred in interpreting or applying the guidelines de novo, and judgment calls for abuse of discretion simpliciter." Id. (citations omitted).

Cruz's procedural challenge is limited in that he does not contest the district judge's determination that the Guidelines recommended a life sentence based on the crimes of conviction and enhancements, nor does Cruz assert that his sentence was based upon clearly erroneous findings of fact or that the district judge failed to adequately explain the life sentence. Instead, Cruz argues that the district judge erred by treating the Guidelines as mandatory. He further argues his sentence should be vacated because it is (1) disproportionate to the shorter sentences imposed on other codefendants who entered into plea agreements with the government, and (2) equal in length to the life sentence given to his brother Ayala, who headed up the entire illicit organization. According to Cruz, this outcome demonstrates that the district judge failed to apply the Section 3553(a) factors in crafting his sentence. Thus, Cruz urges us to find the district judge "failed to make an appropriate individualized assessment and because he went to trial considered the guidelines mandatory[,] all which rise to the level of procedural error warranting remand for resentencing."

The first claimed error need not detain us long. Although "treating the Guidelines as mandatory" is procedural error, Gall, 552 U.S. at 51, the district judge did not do so here. Before pronouncing sentence he explicitly referred to the Guidelines as "advisory." Nothing in the transcript of the sentencing hearing gives even the barest hint that, in spite of this statement, the district judge felt bound by the Guidelines or that he considered the life sentence to be mandatory.

Cruz's more significant procedural argument is his contention that the district judge failed to apply 18 U.S.C. § 3553(a)(6) because he did not consider the disparity between his sentence and those given to Ayala and to other codefendants who cut plea deals. Cruz had asked the district court to apply a below-Guidelines sentence in light of shorter sentences meted out to others involved in the DTO. He argued that this specific factor, 18 U.S.C. § 3553(a)(6), requires a sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[33]

---

[33] The government contends that Cruz waived any arguments of disparity between himself and Ayala by failing to raise them at the sentencing hearing. In his Sentencing Memorandum filed prior to hearing, Cruz set forth his position that the Guidelines range is "so high" as a result of "facts affecting co-defendant [Ayala] directly and not pertaining to [Cruz]." According to Cruz, "there was a great difference in the evidence presented during trial as to what pertained to [Cruz] and to what pertained to co-defendant [Ayala]." Cruz then argued it would be "unjust and unfair" to

-59-

Cruz insists on appeal that the codefendants who entered guilty pleas are "similar" to him for purposes of sentencing because, like those individuals, Cruz was not the head of the DTO. He claims this type of comparison to the other "less culpable" defendants in his own case is mandated by Gall v. United States, 552 U.S. 38 (2007). And because the district judge refused to compare his sentence against those of other codefendants as required by § 3553(a)(6), Cruz contends his sentence is illegal. See Gall, 552 U.S. at 51 (including a sentencing court's failure to consider the § 3553(a) factors among the species of procedural sentencing errors).

The government fires back, defending the trial judge's decision on two fronts. First, the government argues that the disparities to which § 3553(a) refers are national sentencing disparities, not disparities within one specific case. The government further urges us to find that because the other codefendants pleaded guilty and thereby accepted responsibility for

weigh these facts against Cruz as heavily as against Ayala. At the sentencing hearing, counsel stated Cruz would rely on the Sentencing Memorandum, but also expressed his opinion that most of the evidence at trial was directed towards Ayala, not Cruz. And, although the majority of his "disparity arguments" focused on the lesser sentences meted out to "defendants with similar records and conduct," the issues of his culpability compared to Ayala and of sentencing disparities among defendants named in the Indictment were clearly raised before the district court. Therefore, we decline to find that Cruz waived this aspect of his argument.

their roles in the DTO, they are not in a similar position to Cruz, and it is not appropriate to compare their sentences to Cruz's.

Here, the district judge stated he considered all of the factors enumerated in 18 U.S.C. § 3553(a) in crafting Cruz's sentence. The judge's explicit statement is a point in favor of our finding that the judge weighed each of those factors and, therefore, that the sentence is procedurally reasonable. See Clogston, 662 F.3d at 592 (giving "some weight" to a sentencing judge's statement that he considered all of the § 3553(a) factors). Accordingly, we presume the trial judge applied 18 U.S.C. § 3553(a)(6) and considered whether Cruz's life sentence was disparate as compared to other individuals with similar records and who had been convicted of similar crimes.

When weighing the § 3553(a) factors, the trial judge categorically rejected Cruz's assertion that he is "similar" to others who entered guilty pleas and, therefore, that his sentence should be commensurate with theirs. Noting that the other individuals to whom Cruz referred did not require the government to bring them to trial, he stated "the [sentencing] [G]uidelines are very specific that once you go to trial and are found guilty, it is a completely different analysis than it is if you plead guilty and are sentenced." He further made it clear that he did not feel compelled to conform Cruz's sentence to those of his codefendants as, when it comes to disparate sentence lengths, the "disparity [to

-61-

be considered] is among defendants in similar cases throughout the nation, and not within just one case."[34] We take the trial judge at his word that he did not consider Cruz's sentence in light of those given to the other codefendants who pleaded guilty because, in his view, those individuals were not similarly situated to Cruz for sentencing purposes. The judge did not err in so concluding.

Cruz relies heavily on Gall and posits that the Supreme Court's holding there required the trial judge to compare his sentence to those of other codefendants in his case. Cruz, however, misapprehends Gall's teaching. In reality, Gall's core holding is that a sentencing court should not blindly apply the advisory Guidelines to an individual before it and should "'consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" 552 U.S. at 52 (quoting Koon v. United States, 518 U.S. 81, 113 (1996)). To that end, and after affording both parties "an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." Id. at 49-50. We have recognized that in light of Gall

---

[34] Focusing his argument on his codefendants, Cruz does not argue that his sentence is not in accordance with those given to similar defendants on a national scale. As such, any such argument has been waived.

and other related Supreme Court opinions, "district judges are empowered with considerable discretion in sentencing . . . ." United States v. Taylor, 532 F.3d 68, 69 (1st Cir. 2008).  Of equal importance, Gall firmly establishes that such determinations are the province of the sentencing courts, not the courts of appeal. Gall, 552 U.S. at 52 ("The uniqueness of the individual case, however, does not change the deferential abuse-of-discretion standard that applies to all sentencing decisions.").

Cruz's assertion that Gall requires the district judge to conform his sentence to those given his other codefendants is nothing more than wishful thinking.  To be sure, because Cruz raised the issue at sentencing, the district judge certainly could have considered the disparity between Cruz's and Ayala's sentences and Cruz's and the other codefendants' sentences in fashioning Cruz's sentence.  United States v. Martin, 520 F.3d 87, 94 (1st Cir. 2008) ("[D]istrict courts have discretion, in appropriate cases, to align codefendants' sentences somewhat in order to reflect comparable degrees of culpability--at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system.").  Even after Gall, however, "consideration of sentencing disparity primarily targets disparities among defendants nationally."  United States v.

<u>McDonough</u>, 727 F.3d 143, 165 (1st Cir. 2013).[35]  Thus, the sentencing judge was not bound, as a matter of law, to explicitly consider disparities between Cruz's sentence and those given to Ayala and to codefendants who pleaded guilty.

After carefully reviewing the sentencing record, we conclude that Cruz has failed to show his sentence was affected by any procedural error.

**c.  Substantive Reasonableness**

Having found no procedural error, we move on to Cruz's argument that his life sentence is substantively unreasonable in light of what he characterizes as his limited role in the DTO. Although there is no question here that Cruz's life sentence is a Guidelines sentence, we review sentences for substantive reasonableness "regardless of whether they fall inside or outside the applicable Guidelines sentencing range."  <u>United States</u> v.

---

[35] Cruz tells us the Supreme Court rejected this proposition by vacating our judgment in <u>United States</u> v. <u>Tom</u>, 504 F.3d 89, 94 (1st Cir. 2007) and remanding it to us "for further consideration in light of" <u>Gall</u>.  <u>Tom</u> v. <u>United States</u>, 552 U.S. 1163 (2008). After taking up the matter again, we ordered the district court to reconsider its sentence in accordance with <u>Gall</u> and the concerns expressed in our earlier 2007 opinion, including our judgment that "the justifications given by the court for its lenient sentence did not adequately consider the <u>national interests</u> in federal sentencing, exemplified in part by the Sentencing Guidelines." <u>United States</u> v. <u>Tom</u>, 275 F. App'x 23, 24 (1st Cir. 2008) (unpublished) (emphasis added). Hence, the ultimate disposition of this case belies Cruz's position.  We find no support for, and consequently reject, Cruz's argument that <u>Tom</u>, 504 F.3d 89, and other cases expressing a concern about national sentencing disparities "are no longer good law."

Morales-Machuca, 546 F.3d 13, 25 (1st Cir. 2008).  We "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard," taking into account all of the relevant circumstances.   Gall, 552 U.S. at 51; Leahy, 668 F.3d at 24 (quoting Martin, 520 F.3d at 92).

"[T]he linchpin of a substantively reasonable sentence is a plausible sentencing rationale and a defensible result."  United States v. Pol-Flores, 644 F.3d 1, 4-5 (1st Cir. 2011) (internal quotation marks and alterations omitted).   Where the sentence is within the range of punishment established by the Guidelines, we may, but are not required to, afford that decision a "presumption of reasonableness."   Gall, 552 U.S. at 51.   And, because Cruz's sentence is within the Guidelines range, he "must adduce fairly powerful mitigating reasons and persuade [this Court] that the district judge was unreasonable in balancing pros and cons." United States v. Batchu, 724 F.3d 1, 14 (1st Cir. 2013) (internal quotation marks omitted); see also Clogston, 662 F.3d at 592-93 ("Challenging a sentence as substantively unreasonable is a burdensome task in any case, and one that is even more burdensome where, as here, the challenged sentence is within a properly calculated [Guidelines Sentencing Range].").

Cruz faces a high hurdle and, as it turns out, one he is unable to surmount.   Echoing his arguments with respect to his claims of procedural error, Cruz maintains that his life sentence

is not substantively reasonable because, although he was but a "third tier administrator" of the DTO, his sentence is equal to the one meted out to Ayala, the DTO's kingpin. Thus, the focus in these arguments is Cruz's contention that he should not be subjected to the same penalty as Ayala because Ayala was more culpable than him with respect to the substantial overarching drug conspiracy. Cruz lays out a laundry list of bad acts committed by his brother, but ostensibly not by him, and bluntly asserts that in light of their differing conduct, he "did not deserve the same life sentence" as his brother.

In Cruz's view, he received a life sentence only because the district judge employed a "strict application of the guidelines as reprisal for [Cruz] having gone to trial." He contends that being punished in this way for exercising his constitutional right to a jury trial renders his sentence substantively unreasonable. A reasonable sentence, he asserts, would be something less than life, but lengthier than the sentences given to codefendants who pleaded guilty.

The government points out that the district judge correctly calculated Cruz's offense level and the Guidelines-recommended sentence. The government goes on to argue that the evidence at trial regarding Cruz's personal involvement in the DTO justified his life sentence. Accordingly, the government urges us

to find the district judge did not err by imposing a Guidelines sentence.

The Supreme Court has recognized that, in general, the Guidelines sentencing ranges "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." United States v. Rita, 551 U.S. 338, 350 (2007). Further, "when a district judge's discretionary decision in a particular case accords with the sentence the United States Sentencing Commission deems appropriate 'in the mine run of cases,' the court of appeal may presume that the sentence is reasonable." Gall, 552 U.S. at 40 (quoting Rita, 551 U.S. at 350-51). Here, the district judge recognized the sentencing guidelines are advisory only, yet after consideration of the factors set forth in 18 U.S.C. § 3553(a), imposed a sentence of life imprisonment. Because this is exactly the sentence recommended by the Guidelines, we presume it is reasonable. Cruz is unable to overcome this presumption of reasonableness.

Throughout his brief, Cruz maintains his sentence should be less lengthy than Ayala's because Ayala was "more culpable" in the drug conspiracy. Cruz also asserts that his culpability was more akin to that of the other codefendants who entered guilty pleas and received sentences that do not come close to approaching life in prison. In staking out this territory, Cruz misapprehends our function as an appellate court and the scope of our review.

Determinations as to the relative culpability amongst codefendants are best made by the district judge, who presided at trial, attended to the testimony of the witnesses, and viewed the exhibits along with the jury. See Gall, 552 U.S. at 51-52 (quoting Koon v. United States, 518 U.S. at 98) (recognizing district court judges have "'an institutional advantage over appellate courts in making these sorts of determinations'"). And because the coconspirators who received lesser sentences had entered guilty pleas whereas Cruz stood trial, the district judge was not required to conform Cruz's sentence to theirs because those individuals were not similarly situated to him. United States v. Rodriguez-Lozada, 558 F.3d 29, 45-46 (1st Cir. 2009) (affirming life sentence where the Guidelines-recommended range ran from 360 months to life in light of the "material difference" between the defendants who entered guilty pleas (and received more lenient sentences) and the one who stood trial, such that the sentencing disparity did not "amount to an abuse of discretion"). Accordingly, Cruz's life sentence is not substantively unreasonable simply because certain codefendants received more lenient sentences after they pleaded guilty.

Cruz's next argument is that the district judge failed to consider the fact that his "personal characteristics reflected rehabilitative potential," and justified a below-Guidelines sentence. Cruz notes first that although he himself was abused as a child and witnessed domestic violence in his home, he is a "good

family man and parent." To highlight his rehabilitative potential, Cruz points out that "[a]lthough he lived in such a negative, drug laden environment he never consumed any drugs and when arrested tested negative for all narcotics." Cruz urges us find that the district judge improperly failed to give any consideration to his personal situation and that, had it done so, it would have imposed a lesser sentence.

Cruz's objections are wholly without merit. The district judge in fact explicitly considered (1) Cruz's arrest record and absence of criminal record; (2) his managerial role in the drug conspiracy; (3) the goals of sentencing, e.g., punishment, and deterrence; and (4) Cruz's history and characteristics. Indeed, with respect to Cruz's personal history, the district court found he "abandoned school after the eighth grade," "has no specialized skills, training or professional license," and only "a limited history of formal employment." Although the district court could have considered Cruz's background and claimed lack of drug use as a point in his favor, it could also have concluded his participation in such a wide-ranging conspiracy that preyed upon society's weakest and most vulnerable made his actions even more egregious than someone who participated only as a way to make money to support his own drug addiction.

At bottom, it is manifest from the record that the district judge was not convinced that anything in Cruz's background

warranted departure from the Guidelines-recommended sentence. "That the court chose to attach less significance to certain mitigating circumstances than [Cruz] thinks they deserved does not make his sentence substantively unreasonable." United States v. Colón-Rodríguez, 696 F.3d 102, 108 (1st Cir. 2012). Moreover, Cruz has wholly failed to come forward with any mitigating reasons, never mind "fairly powerful ones," and we are not persuaded that the district judge unreasonably balanced the factors that went into crafting Cruz's sentence. Batchu, 724 F.3d at 13 (internal quotation marks omitted).

All in all, the record demonstrates the district judge imposed a life sentence only after considering Cruz's individual characteristics and history, his prominent role in the conspiracy, and the other factors set forth in § 3553(a). Cruz has not convinced us that the district judge abused his discretion, and he has failed to overcome the sentence's presumption of reasonableness. Cruz's sentence is affirmed.

**CONCLUSION**

The sheer size, scope, sophistication, and profitability of the DTO's Barbosa operations are enough to take one's breath away. The human toll exacted by its illicit activity is unknowable. Only through a painstaking investigation was law enforcement able to curtail its operations and begin to bring its members and leaders to justice. Rather than face trial and the

prospect of paying the full, heavy price for their crimes, many of these individuals elected to plead guilty in the hope of receiving leniency.

Not so Ayala and his brother Cruz. Much as Tennyson's Balin and Balan[36] together sat upon their horses and tested their might against all-comers, these two brothers stood their ground against the full force of the evidence marshaled by the federal government and the testimony of their own partners in crime. In the end, however, Cruz and Ayala fared little better than did Balin and Balan, who perished in each other's arms. The mountains of evidence at trial proved beyond a reasonable doubt that Ayala was the DTO's kingpin, and that his brother Cruz was a trusted lieutenant who helped him oversee and control the scores of individuals involved in the drug sales at Barbosa. Ayala and Cruz, bound together initially by their blood, will now share the same fate: life in prison.

While the brothers struggle mightily in this appeal to get out from under their shared doom, after careful consideration we conclude there is no merit to any of the grounds raised on appeal. Accordingly, we affirm the convictions of Ayala and Cruz in all respects. We affirm Cruz's life sentence as well.

---

[36] Alfred, Lord Tennyson, *Idylls of the King, Balin and Balan*, in *The Complete Poetical Works of Tennyson* 357-66 (Cambridge ed., Cambridge, Houghton, Mifflin & Co. 1898).