# United States Court of Appeals
## For the First Circuit

Nos.  22-1185, 22-1186

UNITED STATES,

Appellee,

v.

MIGUEL AMAURY REYES-BALLISTA,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, Chief U.S. District Judge]


Before

Barron, Chief Judge.
Thompson and Rikelman, Circuit Judges.


Rafael Anglada-López for appellant.

Gabriella S. Paglieri, Assistant United States Attorney, with whom W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.


July 25, 2025

**THOMPSON, Circuit Judge**.    Between February 2014 and December 2015, United States Postal Inspection Service ("USPIS") agents in Puerto Rico outfoxed the fox.    These agents noticed a pattern: several markedly similar but shady looking packages kept heading from Puerto Rico to New York, while some fishy looking parcels from 'The Big Apple' kept winding their way to 'Isla del Encanto.'[1]  Upon further inspection, kilogram quantities of cocaine and boatloads of money, cleverly concealed in household items, were excavated, as was an evidentiary trail leading straight back to defendant-appellant Miguel A. Reyes-Ballista ("Reyes") and two co-conspirators.    After two criminal indictments and a six-day trial, a jury convicted Reyes of participating in two conspiracies to possess with intent to distribute cocaine, and of three counts of possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1).    That conviction landed Reyes a 170 months' prison sentence with four years of supervised release to follow.

Reyes contests his convictions before this court and argues the government provided insufficient evidence to support the jury's verdict.    Separately, Reyes seeks a new trial because he believes inapt communication with his attorney while awaiting trial and his attorneys' performances at trial violated his Sixth

---

[1] 'Island of enchantment' is lovely Puerto Rico's nickname.

- 2 -

Amendment right to counsel.  After reviewing the record and Reyes's arguments, we affirm his convictions and dismiss his Sixth Amendment claim as premature.

## I.  BACKGROUND

Since one of Reyes's claims is a challenge to the sufficiency of the evidence, we provide most of the basic facts here in the light most flattering to the verdict, "reserving additional details for our discussion of the specific issues raised in this appeal."  See, e.g., United States v. Ayala-Vazquez, 751 F.3d 1, 7 (1st Cir. 2014).[2]  From early 2014 through late 2015, Reyes participated in two separate (but incriminatingly similar) drug trafficking conspiracies -- the first alongside Betsy Luz Pérez-Rivera ("Pérez") and the second in tandem with Alberto Santiago-Pagán ("Santiago").

Pivotal moments making up the first conspiracy involving co-defendant Pérez occurred on February 7, 2014 after Reyes hired Pérez to drop off a package for him at a San Juan post office.[3]  At

---

[2] Because Reyes's Sixth Amendment claim does not relate to the basic facts we are about to recite, the facts remain in the light most favorable to the verdict.  See United States v. Negrón-Sostre, 790 F.3d 295, 299 n.1 (1st Cir. 2015).  To the extent any facts related to Reyes's Sixth Amendment claim come up later, we present those facts "in a balanced manner."  United States v. Martínez-Mercado, 132 F.4th 61, 65 (1st Cir. 2025) (internal quotation marks omitted) (quoting United States v. Lanza-Vázquez, 799 F.3d 134, 138 n.1 (1st Cir. 2015)).

[3] Co-defendant Pérez pled guilty to conspiring to possess with intent to distribute cocaine after testifying at Reyes's trial.

trial, Pérez testified that Reyes and another man (a character not relevant to our story today) picked her up at her home and drove her to the post office. Once they arrived, Pérez's job was simple: enter the post office, drop off the package that Reyes gave her, and bring the receipt and any change back out to Reyes. For her role, Pérez received $200 from Reyes.

The package Pérez dropped off -- bearing a tracking number ending in 686 ("Parcel 686") -- quickly attracted the attention of USPIS agents because of its telltale appearance (at least telltale for those trained to be on the alert for odd-looking parcels whiffing of illegality). Parcel 686 was marked for priority express shipping from San Juan[4] (despite a return address in Carolina, Puerto Rico) to New York City and was excessively taped on all sides and along all seams. Sensing something not quite right, USPIS agents (after receiving proper authorization)[5] took a look inside Parcel 686 and found a toaster oven, an owner's manual, and a GPS tracking device with an external battery pack.

---

[4] As one USPIS Agent put it at trial, express shipping can trigger suspicion "because it's less time in the mail and less time for it to be inspected by federal agents."

[5] Today's recitation of the facts includes many packages being opened by law enforcement and, even though we won't pause to mention it each time, each package was opened subject to a federal search warrant or with consent. Protocol ran odd packages through canine lineups, which could help support the warrant requests. Importantly, Reyes does not challenge the lawfulness of any mail raiding done by authorities.

- 4 -

The GPS tracker had the words "GPS tracker" spelled out on one side and a logo resembling a half globe (characteristics that will be important later). A closer examination of the interior of the toaster oven revealed hardened spray foam hiding a .9441-kilogram brick of cocaine.

A few months later in August 2014, the USPIS seized another two packages, this time coming from New York addressed to Reyes in Puerto Rico. The packages had different addresses for Reyes, one unassociated with Reyes and the other being his home address in San Juan. When authorities looked inside these packages, they found two identical, single-burner hot plates, not stuffed with drugs, but hiding $10,000 cash inside each of them.

Shortly after the hot-plate-money packages were seized, an attorney representing Reyes contacted USPIS inquiring about the status of one of them, and Reyes agreed to sit for an administrative interview with USPIS agents. At that October 2014 meeting, the purpose of which was to determine if the cash from the money packages emanated from a legitimate, non-illegal source, Reyes claimed the intercepted money was for some gold he had sold and money he was owed. However, he couldn't say how much gold was involved in the transaction or how much money he was supposedly owed. Nor could he recall the name and address of the person sending payment. When further questioned, Reyes also admitted to regularly sending and receiving money or merchandise to and from

New York concealed in objects. During the interview, USPIS showed Reyes a picture of Pérez and asked whether he knew her. He answered that he had seen her before, but did not know her name. When confronted with a picture of Parcel 686 -- the one Pérez had dropped off at the San Juan post office back in February 2014 -- Reyes gave it a protracted stare but ultimately denied any knowledge of it.[6]

The second charged conspiracy -- this time involving Reyes and Alberto Santiago-Pagán -- began in June 2015 and largely resembles the first conspiracy but with Santiago taking over Pérez's role. Surveillance video from June 10, 2015 showed Santiago dropping off a package -- with a tracking number ending in 887 ("Parcel 887") -- at the Canóvanas Post Office in Puerto Rico. Two days later on June 12, 2015, USPIS agents in New York seized Parcel 887 off an express overnight shipping plane for displaying characteristics consistent with drug trafficking -- express shipping, paid for in cash, with a sender and recipient that shared a last name but had no known association with the listed addresses. Upon further examination, Parcel 887 contained two GPS trackers (with the same label and logo as the tracker in Parcel 686), external battery packs for the trackers, and a box for a household container used, perhaps, to store plastic

---

[6] Due to Reyes's unsatisfactory responses during questioning, USPIS did not return any of the seized cash.

bags. Within the container box, USPIS agents found a .9914-kilogram brick of cocaine encapsulated by hardened spray foam like that found inside Parcel 686.

USPIS agents back in San Juan seized their next package ("Parcel 310") from the Canóvanas Post Office on August 24, 2015. They removed Parcel 310 from the mail-stream for displaying characteristics ostensibly consistent with drug trafficking (the same as before: that is, express priority shipping, paid for in cash, with a sender and recipient that shared a last name but did not correspond with the addresses listed). When agents opened Parcel 310, they found a trash can along with two GPS trackers (displaying the now-familiar label and half globe logo), and another portable battery. The trash can was filled with hardened spray foam hiding a 1.0068-kilogram brick of cocaine. USPIS did not have surveillance footage for when Parcel 310 arrived at the post office, but, now aware of a distinct pattern, learned that five more packages were sent from the Canóvanas Post Office during August and September of 2015 displaying the same external characteristics as Parcel 310 (the post office can't catch all the drugs that come through the mail). For those additional packages that fit the description but were not interdicted, the same handwriting appeared on the labels and video surveillance showed Santiago making the drop off.

As we round the corner in our recitation of the facts, here's where law enforcement became increasingly aware of Reyes's involvement. On October 2, 2015, USPIS conducted a stake out at the Canóvanas Post Office (they choose this date because it was a Friday and Santiago had come the previous two Fridays to drop off packages). Late in the afternoon, Santiago, indeed, arrived in a white Dodge Ram pickup truck driven by Reyes. Santiago had two packages in hand, and after dropping them off at the post office, USPIS seized one ("Parcel 929") and let the other pass through to avoid raising suspicion from Reyes. As expected, the seized Parcel 929 contained a coffee urn filled with hardened spray foam, two GPS trackers with the same label and logo as before, and a spare battery pack. Beneath the dense foam of Parcel 929 lay two bricks of cocaine weighing 2.0106 kilograms collectively.

USPIS kept up its surveillance and saw this pattern of events unfold again on October 30, 2015. This time, the same white Dodge Ram pickup brought Santiago to the Plaza Las Americas Post Office. After Santiago dropped off a package, USPIS let it pass through so Reyes wouldn't catch on and move his operation to a different post office.

On November 5, 2015, USPIS investigators watched Reyes pull up to the post office in the same white pickup truck and drop off Santiago with what would be the final package seized in this investigation ("Parcel 448"). USPIS agents later opened Parcel

448 and found a pressure cooker, two GPS trackers (yes, same as before), and another external battery pack. They also found a layer of hardened spray foam concealing a 1.0045-kilogram brick of cocaine.

All told, USPIS seized five parcels containing kilograms of cocaine concealed in household items. Between the seized parcels' similar cargo (distinct GPS trackers, battery packs, household items filled with hardened spray foam and drugs), the packages' external similarities (express shipping, paid for in cash, shared last names between sender and recipient with addresses unrelated to the listed names, similar handwriting), and a few other evidentiary kernels, the government decided it had enough evidence to interrupt Reyes's drug smuggling enterprise and bring federal charges against him.

## II. PROCEDURAL HISTORY

On September 27, 2018, a Grand Jury returned two criminal indictments against Reyes for his role in the two drug trafficking conspiracies just described, which resulted in his arrest on October 4, 2018. Eventually, after sorting through ordinary pretrial delays, and after coping with extraordinary COVID-19 Pandemic postponements, Reyes's trial finally got underway on August 4, 2021.

Before we address Reyes's appellate arguments, we pause here to take a look at what was happening on the attorney-client

plane as is relevant to Reyes's ineffective assistance claim. In the interim betwixt arrest and trial, trouble brewed between Reyes and his court-appointed counsel, Miguel Rodríguez-Robles ("Rodríguez"). Each filed motions seeking to separate from one another. Reyes first moved for a new attorney in February 2021 claiming a lack of communication and trust in his appointed counsel. After holding a hearing on Reyes's motion, the district court denied it stating "there [was] ample communication between" Reyes and his attorney as evidenced by the various motions filed by counsel on Reyes's behalf. As a result of this ruling, Rodríguez stayed on the case.

A few weeks later in March 2021, Reyes tried again to replace his attorney for reasons echoing his first go around, but this time, asserting a new gripe -- his belief that Rodríguez had discussed confidential attorney-client information in front of the prosecution at the last hearing. In short order, the district court denied Reyes's second request stating he had not shown any factual or legal basis for appointing new counsel.

Dissatisfied but not discouraged, Reyes pursued a new tack to get rid of his attorney. He filed an ethical complaint against Rodríguez with the Puerto Rico Supreme Court alleging the same grievances as stated in his two-prior pro se motions before the district court. Given this filing, and citing the "considerable conflict of interest" created by having to respond

to his client's allegations a week before trial, Rodríguez moved to withdraw as counsel. In response, the district court (having dealt with Reyes's allegations twice now) found Reyes's claims meritless and denied Rodríguez's motion to withdraw. This time though, the district court, in "an abundance of caution," appointed Reyes a second attorney -- Jospeh A. Boucher-Martinez -- to join Rodríguez in Reyes's defense.

So, with his two-man defense team in place, Reyes exercised his right to a jury trial and in due course, was found guilty of two counts of conspiring to possess with intent to distribute cocaine and three counts of possession with intent to distribute cocaine. Challenging the sufficiency of the evidence below, Reyes moved for judgments of acquittal as to all counts, see Fed. R. Crim. P. 29(c), which the district court denied finding the evidence adequate on all fronts. Reyes timely appealed and here we are.

**III. DISCUSSION**

We start by reviewing Reyes's sufficiency of the evidence claims before taking up his Sixth Amendment challenge.[7]

---

[7] Proceeding in this order makes sense because if Reyes succeeds on his sufficiency of the evidence challenges, we would be compelled to vacate his conviction without the possibility of a retrial for the same offense under the Fifth Amendment's Double Jeopardy Clause. See United States v. Vázquez Rijos, 119 F.4th 94, 100 n.3 (1st Cir. 2024) (citation omitted). In that case, there would be no need to reach his additional claims seeking a new trial.

## A. Sufficiency of the Evidence

### 1. Waiver

To streamline our analysis down the line, we will begin by giving you a heads-up on what we won't be discussing. The government contends that Reyes has waived any challenge to the sufficiency of the evidence sustaining his convictions for possession with intent to distribute cocaine because he failed to raise these arguments on appeal. In his reply brief, Reyes never challenges the government's assertion on this point. After scrutinizing Reyes's arguments, we agree with the government's take on waiver and here's why.

In his opening appellate brief, Reyes generally references "the elements of the offense of conviction," which would seemingly include his convictions for possession with intent to distribute cocaine. But, the remainder of Reyes's arguments speak directly and exclusively to his two conspiracy convictions. Under our settled appellate rule, a party who mentions an argument "in a perfunctory manner, unaccompanied by some effort at developed argumentation" waives that argument. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Accordingly, we will proceed to review the sufficiency of the evidence for Reyes's conspiracy convictions only and find any claim related to Reyes's possession convictions waived. See id.; cf. United States v. Martínez-Mercado, 132 F.4th 61, 72 n.4 (1st Cir. 2025) (finding a

defendant's challenge to the sufficiency of the evidence supporting certain elements of a conviction waived for lack of development).

### 2. Standard of Review

Our focus now narrowed, we turn our squint to Reyes's sufficiency challenge to his conspiracy convictions. Reyes seeks review of the district court's denial of his motion for judgment of acquittal based on the sufficiency of the evidence. Typically, we review preserved challenges of this ilk de novo.[8] See, e.g., United States v. Vázquez Rijos, 119 F.4th 94, 101 (1st Cir. 2024). "In doing so, 'we examine the evidence, both direct and circumstantial, in the light most favorable to the prosecution and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged

---

[8] To preserve this type of challenge for appeal, a defendant generally must move for judgment of acquittal at the end of the prosecution's case (which Reyes did) and renew that motion after presenting their defense (which Reyes did not). See United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995). But Reyes, as the government rightly agrees, has escaped the consequences of "his earlier procedural default" by timely filing a post-verdict motion under Fed. R. Crim. P. 29(c). See id. at 975 n.6; see also United States v. Hernández-Román, 981 F.3d 138, 143 (1st Cir. 2020) (applying a more rigorous standard of review in the absence of a Rule 29(c) motion).

Therefore, Reyes "stands on the same footing" as though he renewed his motion at the close of trial, and we proceed to review his claim de novo. United States v. Castro-Lara, 970 F.2d 976, 980 (1st Cir. 1992).

crime.'" Martínez-Mercado, 132 F.4th at 72 (quoting United States v. Cruz-Rodríguez, 541 F.3d 19, 26 (1st Cir. 2008)); see also United States v. Pérez-Greaux, 83 F.4th 1, 23 (1st Cir. 2023) ("[R]eversal is warranted only if we find that no levelheaded jury could have found [Reyes] guilty." (internal quotation marks omitted) (quoting United States v. Guerrier, 669 F.3d 1, 7 (1st Cir. 2011))).

### 3. Evidence of the Conspiracies

In our review of Reyes's conspiracy convictions, we ask whether the government has proven beyond a reasonable doubt: "(1) that an agreement existed to commit the particular crime; (2) that the defendant knew of the agreement; and (3) that he voluntarily participated in it." Cruz-Rodríguez, 541 F.3d at 26 (citing United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001)).[9] Evidence of the conspiratorial agreement and of a particular defendant's knowledge of that agreement may be "express or tacit and may be proved by direct or circumstantial evidence." Id. (quoting Gomez, 255 F.3d at 35); see also United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993). Likewise, proof of Reyes's involvement in the conspiracy "may consist of indirect evidence, including reasonable inferences drawn from attendant

---

[9] Reyes limits his appeal to the second and third elements of a conspiracy and does not dispute that someone attempted to move drugs through the mail using the packages that USPIS seized.

circumstances." United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir. 2005) (quoting United States v. Echeverri, 982 F.2d 675, 679 (1st Cir. 1993)). With these standards as our guide, we turn to the evidence produced at trial.

### i. The Pérez Conspiracy

Reyes challenges the sufficiency of the evidence proving he had knowledge of and participated in a drug trafficking conspiracy with Pérez based on what he perceives as three flaws in the government's case against him: (a) Pérez's testimony was not credible; (b) none of the evidence showed Reyes entering the post office; and (c) the discovery of Reyes's fingerprints inside Parcel 686, alone, was not enough to support his conviction. In contrast, the government argues ample record evidence supports the jury's conclusion that Reyes knew about and did in fact participate in a conspiracy with Pérez.

### (a)

In reviewing the record with Reyes's credibility argument in mind, we see that Pérez's testimony furnished an important link demonstrating Reyes's knowledge of and participation in the convicted conduct. Pérez told the jury how Reyes picked her up in February 2014 and brought her to the post office to drop off Parcel 686 for him. When asked whether she knew if drugs were inside Parcel 686, Pérez responded that she did "[b]ecause when something is not illegal, you don't give a person

- 15 -

$200 to send a package that you can send yourself." Pérez also testified that after dropping off Parcel 686, Reyes came to her house and asked her to call the post office to find out the package's whereabouts. At this time, Reyes could see the location of Parcel 686 on a tablet connected to the GPS tracker which indicated the package had been seized.

Pérez also filled in the jury on some of her other interactions with Reyes beyond dropping off Parcel 686. By her own terms, Pérez had been sending parcels to New York for Reyes for "a long time." Pérez testified that, on one occasion, she watched Reyes place a "small, black device" inside a package along with "a pot or an oven with something white melted." Then, when shown the contents of a notebook seized from her home in March 2014, Pérez explained that she wrote down names and addresses that Reyes gave her to put on parcel labels. The two names that the government honed its questioning on shared the last name Justiniano, with Michael Justiniano having an address listed in New York and Maria Justiniano living on Escorial Avenue in San Juan, Puerto Rico. The parcels sent by Santiago over a year later (during the second charged conspiracy) all used sender addresses from Escorial Avenue with two listing the same house number on Escorial Avenue that Pérez wrote down. Additionally, one of the packages with hot plates stuffed with cash addressed to Reyes came from Michael Justiniano.

Although Reyes would have us find Pérez and her testimony too flawed to be believed, on appellate review, "[i]t is not our job to re-weigh the evidence or second-guess the jury's credibility determinations." United States v. Bobadilla-Pagan, 747 F.3d 26, 32 (1st Cir. 2014); see also United States v. Meises, 645 F.3d 5, 12 (1st Cir. 2011) ("The jury assesses witness credibility."). Here, the jury heard Pérez's story involving Reyes and their drug trafficking conspiracy prefaced with information about Pérez's criminal history (the government, on direct, walked Pérez through her prior convictions) and her possible motivations to lie. When it came time for Reyes to cross, he probed Pérez about the conversations she had had with the prosecution. At trial's end, the district court gave a thorough jury instruction advising "particular caution" when considering Pérez's testimony.[10] But even after taking in all this information, and after digesting the district court's charge, the jury still convicted Reyes for conspiring with Pérez to traffic drugs. Because "we cannot reweigh witness credibility on a sufficiency challenge," Vázquez Rijos, 119 F.4th at 102, we resolve any credibility conflict in favor of

---

[10] Said the court in part, Pérez "may have had reasons to make up stories or exaggerate what others did because she wanted to help herself. You must determine whether her testimony may be affected or not by any interest or -- interest in the outcome of the case, any prejudice for or against the defendant, or by any benefits she may receive from the government as a result of her testimony, but you are the ones to evaluate and assign credibility and weight, that means significance, to that testimony."

the prosecution and reject Reyes's argument questioning Pérez's credibility, see United States v. Acosta-Colón, 741 F.3d 179, 191 (1st Cir. 2013).

(b)

Next, Reyes seeks vindication because the government did not present any evidence placing him inside the post office in February 2014 when Pérez dropped off Parcel 686. Despite being factually correct, Reyes's presence in the post office was not a fact the government necessarily needed to prove at trial. A conspiracy must involve an agreement to do an unlawful act, but each co-conspirator does not need to "participate in every act in furtherance of it." United States v. Martinez-Medina, 279 F.3d 105, 113 & n.3 (1st Cir. 2002) (collecting cases).

Although the government's evidence did not attempt to place Reyes inside the post office making the drop himself, that fact does not vitiate the remaining evidence of Reyes's knowledge and role in this drug trafficking scheme, particularly Pérez's trial testimony. After all, Pérez had her job and Reyes had his. Instead, the evidence allowed a jury to reasonably infer that Pérez and Reyes made an agreement to illegally distribute drugs through the mail and that Reyes took steps in furtherance of that agreement. See id. at 114 (explaining that a jury could find evidence of a drug operation conspiracy by piecing together the defendants' separate roles in that operation); see also United

States v. Raymundí-Hernández, 984 F.3d 127, 140 (1st Cir. 2020) (concluding a jury could infer a defendant knew his services advanced a drug conspiracy even if none of the boxes containing drugs were opened in his presence).

(c)

Reyes's final attack on his conviction arising from his conspiracy with Pérez challenges fingerprint evidence brought by the government at trial. Here's the scoop on that evidentiary nugget. USPIS's investigation revealed Reyes's fingerprints on the adhesive side of the tape used to seal Parcel 686 and inside the package on the toaster oven instruction manual. At trial, a fingerprint expert described how fingerprints on the adhesive side of the tape indicates that individual "touched the sticky side of the tape before it was placed to seal the box." Reyes argues that the fingerprint evidence "alone was not sufficient to validly convict" him and he alludes to deficiencies in the process deployed by the fingerprint analysts. Reyes's arguments face two glaring problems.

First, to the extent that Reyes contends the "subjective" nature of the fingerprint analysis used here makes this evidence unreliable, we have previously found the method deployed here sufficiently reliable and Reyes gives us no meaningful reason to doubt that determination here. See United States v. Pena, 586 F.3d 105, 110 (1st Cir. 2009) ("Numerous courts

have found expert testimony on fingerprint identification based on the ACE-V method to be sufficiently reliable under Daubert.").[11] Adding to that, Reyes had an opportunity to both cross-examine the government's expert and to come forward if he could with contrary evidence of his own, i.e., "the traditional and appropriate means of attacking . . . admissible evidence." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 596 (1993). With "[t]hese conventional devices" in place to safeguard Reyes's trial rights, no error occurred by admitting the government's fingerprint evidence. Id.

Second, the fingerprint corroboration found inside Parcel 686 was not offered as standalone evidence (as Reyes suggests), but rather alongside other relevant evidence unveiled, to wit: substantial testimony from USPIS inspectors and Pérez tying Reyes to the package, photos of the seized parcels including those addressed to Reyes containing hot plates stuffed with cash, and Reyes's inconsistent statements to USPIS while trying to retrieve that cash. In other words, the jury did not consider the

---

[11] Reyes filed a motion in limine to exclude testimony from the government's fingerprint expert and to request a Daubert hearing. At that hearing, defense's own expert witness Mr. Díaz-De León testified that the ACE-V method was a well-known and reliable method thus openly contradicting the argument raised in Reyes's motion. The district court later denied Reyes's motion because the government's fingerprint experts used widely accepted methods and Reyes failed to raise any novel challenge to the use of these methods in his motion.

fingerprint evidence in a vacuum and instead had a stout supply of evidence from which to draw its culpability conclusion. See United States v. Martin, 228 F.3d 1, 10 (1st Cir. 2000) (explaining that "juries need not evaluate pieces of evidence in isolation, but may draw conclusions from the sum of an evidentiary presentation").

After considering the totality of the record evidence, a reasonable jury could conclude beyond a reasonable doubt that Reyes knew about the agreement to ship cocaine through the mail and took steps to see this plan succeed. See Raymundí-Hernández, 984 F.3d at 141-42. Accordingly, we affirm Reyes's conviction for the conspiracy involving Pérez.

ii. The Santiago Conspiracy

Moving on to Reyes's second conspiracy conviction, he mounts similar challenges to the sufficiency of the evidence and argues that the government failed to prove he had knowledge of and participated in a drug trafficking conspiracy involving Santiago. In support of his claim, Reyes regurgitates a now familiar refrain: the government never proved he entered any post offices or personally dropped off any of the seized packages; and the presence of his fingerprints on the adhesive side of the tape on Parcels 448 and 929 alone cannot support his conviction.

It should come as no surprise to the gentle reader that we are not moved by Reyes's argument disparaging the evidence against him for "fail[ing] to place him in any of those so-called

- 21 -

deliveries."  As we've already pointed out, Reyes did not necessarily need to enter the post office and drop off the packages himself in order to participate in the conspiracy with Santiago. See Martinez-Medina, 279 F.3d at 113 & n.3.  And as we are about to explain now, a reasonable jury could find that the government (as with Pérez) has proved beyond a reasonable doubt that Reyes fulfilled his role in the conspiracy with Santiago.  To paraphrase us, Santiago had his job and Reyes had his.

Reyes's repeat argument that his fingerprints on Parcels 448 and 929 alone cannot support his conviction reminds us of an ostrich burying its head in the sand -- it simply ignores the bulk of the evidence presented at trial demonstrating his knowledge of and participation in the conspiracy with Santiago.[12]  Security footage documented Santiago's trips to different post offices in Puerto Rico to drop off several suspicious packages marked for express shipping, paid for in cash, heading for New York, and with senders and recipients who shared a last name but were not associated with the listed addresses.[13]  Of the four parcels

---

[12] Reyes makes similar allegations toward the "subjectiveness" of the fingerprint analysis conducted in this case; but, as stated above, we reject such an argument because the method used by the government's expert has before undergone our scrutiny and has been found sufficiently reliable by this court.  See Pena, 586 F.3d at 110.

[13] Parcel 929, dropped off by Santiago on October 2, 2015, was unique in that the sender and recipient did not share a last name.

Santiago dropped off that were later seized and inspected -- Parcels 929, 448, 887 and 310 -- each contained the same GPS trackers and battery packs along with cocaine bricks covered in hardened spray foam within some sort of household item.

In addition to this circumstantial evidence, the government provided direct evidence that Reyes drove Santiago to the post offices where Santiago dropped off the illicit freight. On October 2, 2015 (the date Parcel 929 was dropped off), USPIS officers conducting surveillance testified they saw Reyes drive Santiago to the Canóvanas Post Office in a white Dodge Ram pickup truck. While leaving the post office, Reyes was stopped by Puerto Rico police for a traffic violation and produced his driver's license for the police officer conducting the stop. On October 30, 2015, USPIS saw the same white Dodge Ram bring Santiago to a different post office -- the Plaza Las Americas Post Office -- where he dropped off another package. And then, on November 5, 2015, authorities watched Santiago arrive at the Plaza Las Americas Post Office in the same white Dodge Ram and this time USPIS agents followed the truck when it left. The truck drove to Reyes's residence, and agents watched Reyes and Santiago exit the truck together. Santiago soon after left the residence in a separate car already parked at Reyes's house.

---

Parcel 929's other characteristics remained true to the above-mentioned pattern.

- 23 -

From this evidence -- and Reyes's fingerprints inside Parcels 929 and 448 -- a reasonable jury could conclude that Reyes had knowledge of and participated in a drug trafficking conspiracy alongside Santiago.  See Ayala-Vazquez, 751 F.3d at 12 (considering cumulative evidence from the perspective of a reasonable jury).  Our role requires that we "view[] the record in the light most flattering to the government, accepting all . . . 'reasonable inferences from the evidence (whether or not inevitable)' that tend to support the government's theory of the case."  United States v. Seng Tan, 674 F.3d 103, 108 (1st Cir. 2012) (quoting United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999)).  As a result, we affirm Reyes's conviction for the conspiracy involving Santiago and find his challenges to the sufficiency of the evidence without merit.

## B. Ineffective Assistance of Counsel

Reyes's final appellate asseveration seeks a new trial based on an alleged derogation of his Sixth Amendment rights.  See U.S. Const. amend. VI.  From Reyes's perspective, "defense counsel simply failed to adequately communicate with his client," "did not comply with his client's demands and did not listen to his client's legal wishes."  And by doing so, counsel "undermined the proper functioning of the adversarial process [such] that the trial cannot be relied on as having produced a just result."  Strickland v. Washington, 466 U.S. 668, 686 (1984).  But as we are about to

unpack, "[t]his claim of error is better left for another day" due to the insufficient record before this court. United States v. Padilla-Galarza, 990 F.3d 60, 93 (1st Cir. 2021).

As both parties acknowledge, this court has generally "held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions." Id. (quoting United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993)). An individual seeking to press an ineffective assistance of counsel claim "ordinarily must raise it in a collateral proceeding brought in the district court under 28 U.S.C. § 2255." Id. at 94 (citing United States v. Santana-Dones, 920 F.3d 70, 82 (1st Cir. 2019)).

Reyes -- understanding the confines of our caselaw -- requests the application of a narrow exception to our general rule. Under this exception, "[w]e may consider such claims, first brought on direct appeal, in those rare instances when 'the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration.'" United States v. Staveley, 43 F.4th 9, 15-16 (1st Cir. 2022) (quoting United States v. Miller, 911 F.3d 638, 642 (1st Cir. 2018)). Reyes views "the instant record [as] more than sufficiently developed" while the government cautions that

Reyes's fact-specific claims raised for the first time on appeal were not sufficiently mined in the district court.[14]

After carefully reviewing the current appellate record, we lack all the "connective tissue" necessary to fully consider and decide Reyes's ineffective assistance claim. See Staveley, 43 F.4th at 16. Although Reyes complained about his attorney to the district court multiple times before trial, and the district court held hearings on Reyes's motions for substitution and Attorney Rodríguez's motion to withdraw, those discussions and decisions were limited and nevertheless only pertain to a portion of Reyes's ineffective assistance arguments. As discussed earlier, the district court appointed Reyes a second attorney -- Joseph A. Boucher-Martinez -- days before trial as a precaution and buffer to Reyes's ethical complaint with the Puerto Rico Supreme Court and Rodríguez's motion to withdraw.[15] On appeal, Reyes's opening

---

[14] At oral argument, the government momentarily switched its tune and agreed the current record is sufficiently developed for review on direct appeal. However, "we are not bound by the parties' agreement" as to whether "the record is sufficiently developed" and ultimately disagree with the government's new perspective. See United States v. Rodriguez, 675 F.3d 48, 56 (1st Cir. 2012).

[15] While not raised in the parties' briefing, it was hinted to at oral argument that Reyes's ethical complaint and counsel's motion in response created a conflict of interest impinging on Reyes's Sixth Amendment rights. Unlike Reyes's ineffectiveness claim, a conflict claim "is not routinely relegated to collateral review." United States v. Segarra-Rivera, 473 F.3d 381, 385 (1st Cir. 2007). This comes from the presumption that an actual conflict of interest between defense counsel and defendant entitles a defendant to relief without needing to prove prejudice.

brief describes "deficient legal representation" with "prior counsel" "[d]uring pretrial and jury trial," but does not clarify which appointed counsel did what when, nor provide any citations to the record to support his statements. (Emphasis added). Cf. Padilla-Galarza, 990 F.3d at 94 (dismissing an ineffective assistance claim on direct appeal where "information about why counsel either took or did not take certain actions [was] scarce").

Furthermore, in his reply brief and at oral argument, Reyes expands his ineffective assistance claim (normally a recipe for waiver under our jurisprudence, see, e.g., United States v. Mojica-Ramos, 103 F.4th 844, 849 n.3 (1st Cir. 2024)), to include allegations against defense counsels' poor trial strategy and the "not at all impressive" cross-examination. The district court never had an opportunity to address these distinct issues at any

---

See United States v. Daniells, 79 F.4th 57, 88 (1st Cir. 2023); United States v. Torres-Rosario, 447 F.3d 61, 64 (1st Cir. 2006). In this case, we follow the lead of our sister courts which have considered the potential conflict of interest created when a defendant files or threatens to file a criminal or ethical complaint against their attorney and determine that the mere act of filing a grievance does not necessarily create an actual conflict of interest. See United States v. Williamson, 859 F.3d 843, 857-58 (10th Cir. 2017) (collecting cases); see also Segarra-Rivera, 473 F.3d at 385 ("Not every bare allegation of a disagreement between lawyer and client is enough to trigger a right to new counsel. An even smaller subset of such disagreements will (even arguably) amount to an actual conflict of interest."). Since we do not see an actual conflict based "on the undisputed facts" before us, this potential conflict claim seems so inextricably intertwined with Reyes's ineffective assistance claim as to be better suited for a collateral proceeding before the district court. Torres-Rosario, 447 F.3d at 64.

prior hearings, and like the questions of how much communication, the quality of communication, and who was communicating with Reyes, each remains a factual question that falls outside the purview of the appellate record here. See Padilla-Galarza, 990 F.3d at 94 (finding gaps in the appellate record where "the district court has made no detailed appraisal of the lawyer's performance"); see also United States v. Torres-Rosario, 447 F.3d 61, 65 (1st Cir. 2006) (declining to review a Sixth Amendment conflict of interest claim where the court "ha[d] only [the defendant's] word as to what occurred and no explanation from counsel"). In order to grant Reyes the benefit of measuring the cumulative effects, if any, of any errors from counsel, see United States v. Baptiste, 8 F.4th 30, 39 (1st Cir. 2021), a full record for his ineffective assistance arguments must be developed at the district court.

So, rather than "playing blindman's buff," Padilla-Galarza, 990 F.3d at 94 (quoting Mala, 7 F.3d at 1063), we adhere to our court's general practice of dismissing ineffective assistance of counsel claims first raised on direct appeal. And as we've done under similar circumstances, we do so without prejudice to Reyes's right to pursue all aspects of his ineffective assistance claim in a proceeding for post-conviction relief under

28 U.S.C. § 2255.  <u>See</u> <u>United States</u> v. <u>Rodriguez</u>, 675 F.3d 48, 55 n.9 (1st Cir. 2012).[16]

## IV. CONCLUSION

For the foregoing reasons, Reyes's convictions are **<u>affirmed</u>** as to all counts and his Sixth Amendment claim is **<u>dismissed without prejudice</u>**.

---

[16] Reyes submitted a pro se "Motion to Supplement the Record with Additional Argument" based on a comment made for the first time by the government at oral argument.  That motion questions the impartiality of the district court judge due to her "dual role as both trial judge and Chief of the Criminal Justice Act (CJA) Panel of Attorneys."  Each United States district court operating under the CJA creates a plan for "furnishing representation for any person financially unable to obtain adequate representation." 18 U.S.C. § 3006A.  In short, CJA involvement "does not create a personal bias or conflict of interest, nor the appearance of bias or conflict."  <u>United States</u> v. <u>Doyle</u>, 731 F. App'x 695, 695 (9th Cir. 2018).  And that's that.

- 29 -